Opinion issued August 29, 2019



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00816-CV

_____

**KATIE SCHMIDT OBERNHOFF, Appellant**

**V.**

**DARON LYNN NELSON, Appellee**

---

**On Appeal from the County Court at Law**
**Washington County, Texas**
**Trial Court Case No. CCL5068**

---

## MEMORANDUM OPINION

Appellant, Katie Schmidt Obernhoff ("Katie"), challenges the trial court's August 22, 2017 Order in Suit to Modify Parent-Child Relationship, entered after a bench trial, granting the counter-petition, filed by appellee, Daron Lynn Nelson ("Daron"), to modify an order in a suit affecting the parent-child relationship. In

five issues, Katie contends that the trial court erred in modifying the existing order in a suit affecting the parent-child relationship, relying on the guardian ad litem's testimony and report, failing to disclose its identity when conferring with the minor child, issuing temporary orders, denying an evidentiary hearing related to Katie's motion for new trial, and denying her emergency motion for an evidentiary hearing on Katie's motion for new trial to present newly discovered evidence.

We affirm.

## Background

In 2004, Katie gave birth to her and Daron's minor child, C.N. On October 15, 2012, the trial court signed an Order in Suit to Modify Parent-Child Relationship (the "2012 order"). The 2012 order appointed Katie and Daron as joint managing conservators and named Katie as the joint managing conservator with the exclusive right to designate C.N.'s primary residence. The order also provided that Katie had the sole exclusive control over a custodial account held for C.N. by Katie and Daron. The funds placed into that account were to be used solely for C.N.'s education, and Katie was required to obtain written permission from Daron to withdraw the funds for any other purpose.

In her Petition to Modify the Parent-Child Relationship, filed on December 2, 2015, Katie alleged a material and substantial change of circumstances since the 2012 order and that modification of that order would be in the best interest of C.N.

In regard to modification, Katie requested that she and Daron be appointed as joint managing conservators, that she be named the conservator with the exclusive right to designate C.N.'s primary residence, and that Daron only be allowed supervised visitation with C.N. because Daron had allegedly been physically abusive toward C.N. Katie requested temporary orders and a temporary restraining order and sought an injunction. In an affidavit attached to her petition, Katie stated that possession of C.N. by Daron would endanger C.N.'s physical health and significantly impair his emotional development. According to Katie, Daron had made verbal threats of abuse directly to C.N., C.N. told Katie that Daron had struck him, which Daron had classified as an accident, and Daron had directed derogatory statements toward C.N. As a result, Katie alleged that C.N. did not want to be in Daron's possession.

On December 16, 2015, Daron filed a Counter-Petition to Modify the Parent-Child Relationship and a Counterclaim for Enforcement of Possession or Access. Daron alleged a material and substantial change of circumstances since the 2012 order and that modification would be in the best interest of C.N. Daron requested that he and Katie be appointed as joint managing conservators, that he be named the conservator with the exclusive right to designate C.N.'s primary residence, and that he no longer be required to pay child support to Katie. Daron requested temporary orders and sought an injunction.

3

On April 19, 2016, after a hearing, the trial court entered temporary orders, appointing Katie and Daron as temporary joint managing conservators, naming Daron as the joint managing conservator with the exclusive right to designate C.N.'s primary residence, and ordering Katie to pay child support to Daron.

*Mother*

At trial, Katie testified that she is currently married to Erich Oberhoff ("Erich") and has two children, C.N. and Z.O. At the time of trial, C.N. was twelve years old and Z.O. was two years old. According to Katie, Z.O. was born in July 2015 and had colic, which caused her to cry and fuss constantly. Katie described Z.O. as inconsolable. Z.O. also had jaundice and a broken collarbone at birth, and right after Z.O. was born, Katie "went two weeks straight with no sleep." In fact, there were many instances in 2015 when Katie was sleep deprived. Although Z.O. outgrew her colic at about six months old, she was still a "high maintenance" child, which caused stress. Katie explained that it was difficult for her to manage C.N. and Z.O. at the same time, especially because Erich was away from the home for two weeks at a time for work. Katie believed that she was suffering from postpartum depression in 2015. At the time, she felt anxious, stressed, overwhelmed, and hopeless.

In regard to her mental health history, Katie noted that at times in the past she was treated for depression, although at the time of trial, she stated that she was not

4

suffering from depression.[1] Katie testified that in 2012 she began seeing a counselor, T'Shana Everitt. In October 2012, Katie went to the emergency room because she was depressed and she had attempted to cut herself on her leg with a butter knife. She spent four or five hours in the emergency room and she did not tell her family, although she asked Daron to watch C.N. Katie explained that during that time, and for approximately two years, she did not get along with her parents because she was "going through a lot." She "had Daron back in [her] life, [she] had . . . migraines, health problems, [she] met Erich, [she] lost jobs[,] and . . . then [she] started having problems with Erich." In 2016, Katie saw another counselor for approximately a month and she saw a psychologist who "gave [her] some sleeping medicine."

In regard to Erich, Katie explained that when Z.O. was born in July 2015, she and Erich were in a "rocky" and unstable relationship, and they were not married. In spring 2016, after the trial court issued its temporary orders in the instant case, Katie ended her relationship with Erich. Katie explained that the difficulty of raising and taking care of Z.O. had put a stress the relationship.

Katie further testified that although Erich has never hit her, during the course of their relationship, she called law enforcement officers "on Erich" six occasions. The first time that she called for emergency assistance, Erich went to jail. In that

---

[1] In contrast, Katie also testified that she was depressed at the time of trial because C.N. was not living primarily with her.

instance, Erich came home angry, started yelling at Katie, and hid her keys and her cellular telephone. When Katie went out to her car to call for emergency assistance, Erich tried to stop her by pulling her out of the car. Katie fell in "sticker burrs," and then ran inside their home, found her cellular telephone, and called for emergency assistance to "come settle [her and Erich] down." C.N. was not present at the time. The second time that Katie called for emergency assistance it was related to a verbal argument between her and Erich, and C.N. was not present. However, the third time that Katie called for emergency assistance, related to a verbal argument between her and Erich, C.N. was present. The last time that she had called for emergency assistance regarding Erich was in November 2015. Katie explained that she and Erich had gotten into an argument and she was scared. In June 2016, Katie requested a temporary restraining order against Erich, and Katie testified that the statements she made in her affidavit attached to her Application for a Temporary Restraining Order and Temporary Injunction were truthful.

Katie additionally testified that her relationship with Erich has changed since 2015. In July 2016, she and Erich reconciled, and they married in July 2017, shortly before trial. They now have a mutually supportive relationship and do not argue. Katie further explained that, after she and Erich reconciled, they began attending couples counseling sessions once a week with their counselor, Everitt, to "repair[] [the] past and to move on for a healthier future." Eventually, Katie and Erich

6

transitioned to attending counseling sessions once a month. Through counseling, Katie and Erich have started to relate to each other differently and have learned how to handle their disagreements. Although they still argue, it had "been awhile" since they has an argument where they yelled at each other. According to Katie, she and Erich plan to have several more children.

In regard to Erich's relationship with C.N., Katie testified that Erich has strong affection for C.N. But, when asked whether C.N. had affection for Erich, Katie stated: "It's been rocky because he's been protective of me, but he's a lot better." Katie explained that C.N. was protective of her because he had seen her and Erich argue in the past. However, in Katie's opinion, as her relationship has improved with Erich, Erich's relationship has improved with C.N. because C.N. no longer feels the need to protect her from Erich. Katie wants C.N. to have a good relationship with Erich.

Katie further testified that she and C.N. have a close relationship. Katie disciplines him and helps him with his homework. After C.N. began living primarily with Daron in spring 2016, Katie would have C.N. do his required reading when he was in her possession, and in fall 2016, Katie took him to a math tutor. Katie does not curse at C.N. or in front of him. She also has lunch with him at school on certain days, and C.N. is glad to see Katie during this time. Katie believes that C.N.'s academics and school behavior are important, but she thinks that C.N.'s emotional

7

and physical well-being is the most important thing. Further, C.N. has a good relationship with Katie's parents and sister, and Katie's mother has helped C.N. with his homework in the past.

In regard to C.N.'s schooling, in fall 2015, Katie moved C.N. to a public middle school because they had "resource" classes and C.N. was not doing well and getting into trouble at his previous school. Katie testified that C.N. would throw pencils at other students, talk during class, and say curse words, and he told another student that "he was going to get his dad to go over to his house and beat him up." C.N. also had a problem listening to his teachers. As a result of his behavior, C.N. received detention and in-school suspension and he was "written up."

Upon changing schools, C.N. was placed in a resource math class in fall 2015, and in spring 2016, he was moved into a resource reading class as well. After being in resource classes, C.N.'s grades improved. In Katie's opinion, any misbehavior that C.N. engages in at school is not related to Katie or the time that C.N. spends with her. And according to Katie, in both fall 2016 and spring 2017, C.N. was involved in fights at school, and those fights did not occur on the days that she had lunch at school with him. In spring 2017, Katie called C.N.'s teachers to reach out to them. Katie further stated that she had heard that while C.N. had been living primarily with Daron, C.N. had gone to school without taking his medication in the morning, and he would not turn in his homework.

In the past, Katie has taken C.N. to visit with her counselor, Everitt, who C.N. trusts and enjoys seeing. While living with Katie, C.N. saw Everitt "off and on." However, since C.N. began living primarily with Daron, he has only seen Everitt nine times.

Katie further explained that C.N. currently takes medication for Attention-Deficit/Hyperactivity Disorder ("ADHD"), which is prescribed by a psychiatrist. C.N. was diagnosed with ADHD at an early age and has taken medication for several years. Katie, her mother, and Daron's wife, Danielle, took C.N. to see his current psychiatrist in November 2015. Although it took several adjustments to get the dosage correct for C.N.'s medication, C.N. has been on the same dosage since February 2016. Since C.N. began living primarily with Daron in spring 2016, Katie has been to one appointment with C.N.'s psychiatrist, and according to Katie, on one occasion she did not learn of C.N.'s scheduled psychiatrist appointment until the night before. Katie testified that C.N. was easier to discipline in 2016 due to his ADHD medication and not because he had begun living primarily with Daron. Additionally, while Katie had summer possession of C.N. in 2017, she gave him half of his ADHD medication dosage "to try it out" and to see how it helped him because, in the past, a doctor had told her "that's what [she] can do." However, after trying the lower dosage for a day, Katie resumed giving C.N. his full dosage of ADHD medication.

Katie also noted that in August 2015 she took C.N. to an inpatient psychiatric facility, where he stayed for six nights. Daron and Danielle were "[n]ot fully [aware] at first" with "what was going on" when C.N. was taken to the inpatient facility, but ultimately Katie informed them. The inpatient facility recommended that C.N. be taken off his ADHD medication until he saw a psychiatrist, which C.N. did not do until November 2015. Thus, C.N. was not taking any ADHD medication for approximately three months. Without his ADHD medication in fall 2015, C.N. "act[ed] up" more and was difficult to raise.

While C.N. was previously in her care, Katie admitted that she had spent "most of 2015 working on [her] relationship with Erich" and "put [C.N.] on the back burner." And she sent C.N. to live with her parents for a considerable amount of time in 2015 because C.N. was comfortable with her parents. However, on one occasion while C.N. was in Katie's home, C.N. told Katie that he was going to the house next door, but instead he "went to the street over and tried to go play on someone's basketball goal." C.N. then walked into an unknown person's house "like he knew [him]," and a firefighter brought C.N. back to Katie. Katie admitted that it was "very hard" for her to discipline C.N. in 2015.

In regard to C.N.'s extracurricular activities, Katie testified that although C.N. played football in fall 2016, she only attended one game, and she did not take C.N. to practices. Further, Erich was involved in football with C.N. for about a month;

10

because Daron then called Katie and told her that "Erich got kicked off the team," which the coach denied. Katie opined that C.N. did not enjoy football and he was not very good at it.

Related to C.N.'s relationship with Z.O., Katie stated that C.N. loves Z.O. and likes spending time with her. Katie testified that she can manage both C.N. and Z.O. at the same time now, and she is able to care for C.N.'s needs. Katie, Erich, and Z.O. currently live a home that is owned by Erich. And Katie's parents helped make the down payment for that house. It has "almost five bedrooms," and C.N. would have his own room if he began living primarily with Katie again. However, the home is also "for sale," and she and Erich may move to Austin or "to the country." Katie noted that if C.N. began living primarily in her home again, her sister or mother could help her in an emergency.

In Katie's opinion, C.N. needs a stable environment and it would be in the best interest of C.N. to live primarily with her. However, since 2012, she has moved multiple times. In 2012, she and C.N. lived with her parents, then she moved to a house on "Moss Road" for two years. Subsequently, Katie and C.N. stayed with Erich's father for a couple of weeks; they "didn't move in," they "just stay[ed] there until [she] figured out where [they] were going." Katie and C.N. then moved back into Katie's parents' home for approximately a year. At some point, Katie also lived, without C.N., in the home of Erich's mother, although she could not recall when that

had occurred and for how long she had stayed there. Katie then moved back into her parents' home and subsequently moved into a "rent house in Burton." C.N. lived with her at that time, and they stayed at the "rent house in Burton" for two months. Katie, C.N., and two of Katie's friends then "moved [in]to another rent house in Burton." Katie and C.N. thereafter moved back into Katie's parents' home, and in March 2015, she moved into a home that Erich had purchased. While Katie lived at Erich's home in 2015, C.N. would stay at the house with Katie three or four nights a week on the weeks that Erich was away for work. During the other times, C.N. would stay with Katie's parents because she "just didn't want that conflict around."

In spring 2016, after C.N. began living primarily with Daron, Katie moved back into her parents' home. And she then moved into the home of her friend, Jessie House, and then back into her parents' home, before finally moving back into Erich's home once they reconciled. Katie testified that C.N. did not stay with her at House's home when he was in her possession, rather she and C.N. would stay at Katie's parents' home during those times. On one occasion, she stayed at a motel with C.N. because they "wanted to just spend time together."

Katie currently works as a part-time bookkeeper for both her sister's restaurant and another business. Katie earns $12 an hour, and she works approximately twenty hours per week. This is her only source of income. Since February 2016, Katie has received training in phlebotomy and as a certified nursing

12

aide. Within the last year before trial, Katie had a full-time job as a secretary for a business but quit because Z.O. was getting sick frequently at daycare. Katie has been unable to find a job as a phlebotomist, and she has no plans to use her training in phlebotomy to find work in the area. However, Katie enjoys "QuickBooks" and would like to do "some kind of accounting thing." At one point in time, Katie also worked at a nursing home. And since 2012, Katie has worked at a bowling alley, two accounting firms, her sister's restaurant twice, and a mattress store, and she attempted to sell birds on her own and without success. Katie also has "a clothing boutique trailer," from which she is not receiving any income. Katie she has had approximately nine jobs since October 2012, but Erich's income is sufficient to support himself, Katie, and Z.O. Katie's parents pay her child support obligation.

With respect to Daron, Katie testified that during a November 2015 telephone call (the "November 2015 telephone call") between Daron and C.N., Daron said: "[P]ut that [f]-ing brat on the phone," referring to C.N.[2] Katie stated that the telephone call was not a "setup" by her, and she was "in and out" of the room when C.N. was speaking to Daron because she was caring for Z.O. at the time.

Katie also stated that she has seen Daron yell at C.N. at times other than just during the November 2015 telephone call. For instance, at a rodeo, C.N. fell off of

---

[2]    The trial court admitted into evidence at trial an audio and video recording of the November 2015 telephone call.

13

a horse and Daron was angry and said that "he was going to kill [C.N.]'s horse," which upset C.N. According to Katie, she has seen C.N. act afraid of Daron, but also not act afraid of Daron, i.e., "sometimes he acts fearful and sometimes he acts happy or excited." Further, although Katie did believe that C.N. was afraid of Daron, she admitted that she did allow Daron to see C.N. more often than the terms prescribed by the 2012 order because she was "going through so much for years."

Katie wants C.N. to have a good relationship with Daron and Danielle. And Katie hopes that Daron wants C.N. to have a good relationship with her; however, at one "drop-off" of C.N., Daron argued with and yelled and cursed at Katie in front of C.N. According to Katie, in two out of ten "drop-off" meetings, Daron has confronted her in some way. And he sometimes "make[s] [her] look bad in front of" C.N. For instance, in fall 2016, Daron yelled at Katie and "told [her] that he under[stood] why Erich left [her] stupid ass," while C.N. was present. Katie noted that she had tried not to disparage Daron in front of C.N., but that Daron had disparaged her on one or two occasions since March 2016. At the time of trial, she and Daron were no longer communicating by telephone or text message. Katie opined that it would be good for C.N. to see his parents communicating in a civil manner. However, Katie also explained that on one occasion when Danielle had asked her to drop C.N. off for a football game, she did not do so because she was "waiting for [Daron] to text [her] about th[e] situation," not Danielle. Katie further

14

noted that while in Daron's care, C.N. got "a huge gash in his foot" that was not properly treated, and Katie took C.N. to the emergency room because it was "swollen black and blue."[3]

Katie additionally testified that in 2014, she borrowed money from Daron and Danielle because she was depressed. Katie has repaid $2,000 to Daron, and she intends to pay him the remaining amount owed. Katie also noted that in the past she has taken money out of C.N.'s custodial account for purposes other than C.N.'s education, such as to pay for her monthly expenses. For instance, at one point of time after the 2012 order was entered, Katie signed a lease on a house, but then lost her job. Daron then told her that she could use the funds in C.N.'s custodial account to "finish getting the furniture for [her] home and pay the bills until [she] found a job." And she and Daron had an oral agreement that she would pay back the funds that she took from the custodial account before C.N. turned eighteen years old. Katie stated that she would start repaying the money back into C.N.'s custodial account when "[her] career start[ed] [to] happen[]."[4]

---

[3]     In his First Amended Response to Katie's Request for Admissions, a copy of which the trial court admitted into evidence at trial, Daron admitted that in June 2016, C.N. "got a bacterial infection in his foot" and Daron did not take him "to see a doctor."

[4]     In her Responses to Daron's Request for Admissions, a copy of which the trial court admitted into evidence at trial, Katie admitted that she had borrowed money from Daron, she had not repaid Daron the money that he had loaned her, and she withdrew funds from C.N.'s custodial account.

*Mother's Psychological Evaluation*

The trial court admitted into evidence at trial a copy of Katie's May 16, 2017 psychological evaluation completed by Dr. Lawrence Bramlette. At the time, Katie reported that she had graduated from high school and had "obtained a medical assistant degree in 2004." She was not currently employed, and she had last worked at an electrician's office for approximately one month. Katie was terminated from that job because she missed work due to Z.O. being repeatedly sick while at daycare. Katie reported that previously she had worked as a waitress at her sister's restaurant and she had been "let go from th[e] job," while she was pregnant with Z.O., because the restaurant's business was slow.

Katie denied narcotics use or prescription medication abuse. And she reported that "for the past two and one-half years, she ha[d] consumed 3-4 beers at a sitting once every 3-4 months." Katie denied having a criminal history.

Related to her mental health history, Katie denied current feelings of a depressed mood, but she also expressed "feeling stressed and anxious and struggling with intermittent feelings of hopelessness." And Katie admitted to experiencing "clinically significant depressive symptoms . . . on multiple occasions." Katie reported that she had been depressed in 2013 and that the depressive episode "lifted approximately two months" before her evaluation. According to Katie, in 2014, she was depressed and "felt [that] no one cared," so she cut herself with a plastic knife

16

because she wanted attention. (Internal quotations omitted.) Katie was taken to the emergency room as a result of the cutting incident. Katie also reported that she had been participating in counseling sessions with Everitt for six years. Regarding "Diagnostic Impressions," the psychological evaluation lists: "Major Depressive Disorder, Recurrent Episodes, In Partial Remission"; "Unspecified Personality Disorder"; "Sexual Abuse of Child" (self-reported); and "Physical Abuse of Adult" (self-reported).

In regard to Erich, Katie reported that their relationship began in April 2012. Although Katie denied a history of physically assaultive fighting or domestic violence, she stated that she had "called the police on [Erich] on six occasions," and Erich was incarcerated on one occasion "on family violence related charges." Katie denied witnessing or suspecting Erich of abusing, neglecting, or otherwise mistreating C.N. However, Katie stated: "[C.N.] doesn't like it when [Erich] yells at me." (Internal quotations omitted.) Katie and Erich began attending couples counseling sessions with Everitt in August 2016, and at the time of her psychological evaluation, they were attending one counseling session a month.

Related to her previous relationship with Daron, Katie reported that they had separated approximately eighteen months after getting married and divorced approximately one year later. Katie reported that Daron had "physically abused her on numerous occasions" and that "people saw bruises on [her] all of the time."

(Internal quotations omitted.) According to Katie, during one incident, Daron "attempted to suffocate her with a pillow," and another time, he "punched her in the face three times in a row." Katie never reported the incidents of domestic violence. Further, Katie stated that Daron was emotionally abusive toward her and would yell at her. Daron was controlling and would not allow her to work. Daron was "arrested on multiple occasions for violating a protective order," and according to Katie, Daron "abused alcohol on a daily basis."

In regard to C.N., Katie reported that while he lived primarily with her, he was current on his medical checkups and immunizations. Katie's home was, and continued to be, stocked with food, appropriately furnished, had all utilities, and was "free from unsanitary or otherwise inappropriate living conditions." He was exposed to yelling arguments while in Katie's possession, but he was not exposed to domestic violence or narcotics use. C.N. was not abused or neglected.

Further, during the 2014-2015 school year, while C.N. lived primarily with Katie, he missed two to three weeks of school because "he didn't feel good" and she "babied him." (Internal quotations omitted.) Katie also reported that C.N. was hospitalized at an inpatient psychiatric facility for six days in August 2015 because "he had flashbacks of [Daron] being mean." (Internal quotations omitted.) According to Katie, Erich yelling at her is what triggered the flashbacks.

18

In regard to C.N.'s removal from her care, Katie reported that she had been experiencing significant relationship stress with Erich at the time and she was "putting [C.N.] on the back burner and focusing on Erich . . . too much." (Internal quotations omitted.) During that time, Katie began going out with friends and drinking and she lost her job. Katie also reported that she had borrowed $7,000 from Daron because she had "become involved with spiritualists," who claimed to practice a variation of witchcraft. (Internal quotations omitted.) The spiritualist told Katie that she needed to pay her $6,000 to "perform a ritual that would result in positive changes in [Katie's] life." Katie gave the spiritualist $5,000 and did not hear from her again. Katie stated that she "still owe[d] Daron a lot of money."

Katie further reported that since C.N. began living primarily with Daron, he had adjusted poorly and was receiving failing grades at school. In Katie's opinion, C.N. was "terrified" of Daron and "hate[d]" Danielle. (Internal quotations omitted.) Katie noted that she was seeking to have C.N. returned to her primary care.

Related to C.N.'s "specific parenting needs," the psychological evaluation concludes that at a minimum, C.N. requires a stable home environment that is free from significant parenting failures, including parent-sanctioned school absences, volatile relationship dynamics, repeated domestic disturbance calls to law enforcement officers, and erratic parenting behaviors. Because of this, Dr. Bramlette listed the following as areas of concern: Katie's report that she had called law

19

enforcement officers on Erich on six occasions, with Erich being arrested on one occasion, because it indicated a volatile relationship; Katie's report of Erich yelling at her and the distress that it had cause C.N., particularly because Erich's yelling contributed to C.N.'s inpatient psychiatric hospitalization; Katie's report of borrowing $7,000 from Daron and using the money for a "spiritualist ritual," which constituted erratic behavior and was indicative of poor judgment; Katie's report of cutting herself for attention; Katie's report of repeatedly allowing C.N. to miss school because she "babied" him; and Katie's report of C.N. being "terrified" of Daron and "hat[ing]" Danielle and whether that was leading to parental alienation issues. (Internal quotations omitted.) Should C.N. resume living primarily with Katie, Dr. Bramlette recommended that Katie participate in individual counseling sessions and that Katie, Erich, and C.N. participate in family counseling sessions. Dr. Bramlette lists in the psychological evaluation specific goals for Katie related to psychological functioning and parenting.

### *Restraining Order*

The trial court admitted into evidence at trial a copy of Katie's Application for a Temporary Restraining Order and Temporary Injunction filed against Erich on June 15, 2016. In her affidavit attached to her application, Katie testified that she met Erich in April 2012 and they started dating. In September 2012, Katie moved out of her parents' house and into a rental house, and Erich moved in with her.

20

Although their relationship was stable for a couple of weeks, "[a]fter one of [their] first arguments, Erich packed his clothes and left." Erich came home the next morning after the fight, but on many occasions "in the years that [they had] lived together," when Erich would become upset or angry, he would "just pack his bags and say [that] he was done." (Internal quotations omitted.)

Katie further testified that, early in their relationship, Erich "would take [her] [tele]phone and keys to try and prevent [her] from leaving during an argument." And on one night, in November 2012, Erich came home and started arguing with Katie. He then "tried [to] shov[e] nicotine down [her] throat, pinned [her] down on the bedroom floor, and tried to rip [her] shirt off." When Katie "got away from him," she ran to her car to "call for help." However, "Erich pulled [her] out of [the] driver's seat [of the car] before [she] was able to call." Katie "fell in sticker burs and was covered in them." Katie eventually called for emergency assistance and two law enforcement officers arrived. The officers stated that "they had to take [Erich] in" because he and Katie lived together. Erich later called her "after being booked" and apologized and asked if she "would take him back, again." Katie forgave him and he "promised never to hurt [her] again." In December 2012, Erich's family "started being negative about [his and Katie's] relationship and blamed [Katie] for [Erich] going to jail."

21

Moreover, Katie testified that in April 2014, Erich "broke off" his relationship with Katie, and during that time, Katie moved back in with her parents. Despite the separation, Katie became pregnant with Erich's child, Z.O., and they eventually reconciled.

According to Katie, her father then made a down payment on a home for her and Erich. However, because Katie "didn't have good enough credit to back up the mortgage," the house was put in Erich's name only. Erich and Katie moved into the home in March 2015, when Katie was five months pregnant with Z.O. Erich asked Katie to quit her job and "promised to cover [her] expenses."

At some point, Erich found a job that required him to be gone for two weeks at a time. When Erich was away for work, he would leave Katie without any money to care for Z.O. Erich also "started wanting to go out all the time," and this made Katie the sole caretaker for Z.O.

Katie further testified that in November 2015, Erich came to the house late one night wanting to take Z.O. to his brother's home. When Katie told him "no," Erich tried to "snatch her from [Katie's] arms." (Internal quotations omitted.) Katie then "loaded [C.N.] and [Z.O.] in the car to get away from [Erich] because [Katie] could tell that he was getting angry." As Katie buckled Z.O. into her car seat, Erich pulled Katie from the car door. C.N. told Erich to "leave [his] mom and sister alone." (Internal quotations omitted.) And Erich left. Afterward, Erich went back to

22

"behav[ing] well for a few weeks and then [he began] act[ing] threatening" again. Erich ended his and Katie's relationship in March 2016.

Katie additionally explained that, "Erich displays wildly different behavior. He will threaten [her] and be hateful for [a] couple weeks" and then "act nice." Katie stated that she was afraid of Erich and his unpredictable behavior, and Erich has said "degrading, belittling, and slanderous comments" about Katie. Katie opined that it would not be in Z.O.'s best interest to have unsupervised visitation with Erich "due to his lack of responsibility." And Erich and his family would not be "positive influences in [Z.O.]'s life."

*Step-father*

Erich testified that he is married to Katie and he works on "a drilling rig." Erich met Katie in 2012 and they started living together, along with C.N., a few months after they started dating. They have one child together, Z.O.

Currently, Erich, Katie, and Z.O. live in a four bedroom house with space for C.N. When they were short on furniture at the house, C.N. may have slept on the couch or in Katie's bedroom while Erich was away. And for a certain unmentioned length of time, C.N. did not have a bed at Erich's house.[5] In the past, C.N. had also lived with Erich and Katie in the home of Erich's father, with all three of them sharing the same room. In another house, where Katie, Erich, and two of Katie's

---

[5] Erich stated that, at the time of trial, C.N. had a bed at the house.

friends lived, C.N. slept in the same room as Erich and Katie. However, according to Erich, C.N. stayed about sixty percent of the time with Katie's parents. Eventually, Erich purchased the home where he and Katie now live, however, Katie's name is not on the deed. Erich noted that at one time in the past, he tried to evict Katie from their home. At the time of trial, Erich and Katie's home was "for sale," and Erich hoped that they would move "somewhere in the country."

Erich further testified that C.N. is his step-son and they have a good relationship. Erich takes C.N. fishing, and they play basketball and video games together. Previously, Erich helped with C.N.'s football team. When asked whether he had ever physically disciplined C.N., Erich stated: "[M]aybe . . . a handful of times when there ha[d] been times where he[] . . . disrespected [Katie] to the point where[] . . . he wouldn't do what she said." Erich also stated that he had helped C.N. with his homework "a handful of times" and he had eaten lunch with C.N. at school. While he is in Katie's possession, after school, C.N. does his homework, if he has any, and then he has "leisure time" where he plays video games until bedtime.

In Erich's opinion, C.N. enjoys the time that he spends with Katie and they have a close relationship. Katie is the primary disciplinarian, and she disciplines C.N. by taking away his video games. Further, C.N. responds to Katie's disciplinary tactics, and Katie has control over C.N. However, Erich noted that, in the past, Katie has not always been able to control C.N.'s behavior. In Erich's opinion, C.N.'s

24

physical and emotional well-being would not be impaired if he was to live primarily with Katie.

In regard to Z.O., Erich explained that she was a difficult baby and he and Katie were stressed after she was born particularly because Erich would leave Katie alone at home with Z.O. for two weeks at a time so that he could go to work. Erich would then return home for two weeks and subsequently leave again for another two weeks. According to Erich, Z.O. would scream "on and off continuous[ly]." The stress of having Z.O. caused "friction" in his and Katie's relationship, and Erich and Katie argued every day. Erich and Katie broke off their relationship in spring 2016, but later reconciled in summer 2016. And he and Katie then began participating in couples counseling sessions together "[t]o fix the problems that [they] were having at the time." Through counseling, he and Katie have learned tools for resolving their "communication issues." Their relationship is strong now, and they continue to attend couples counseling sessions. They do not argue "like [they] used to." Erich estimated that, over the course of their relationship, he and Katie had separated "a handful of times."

Erich also confirmed that, in the past, he would take Katie's cellular telephone and keys in order to prevent her from leaving during an argument. And on one occasion, he "tried [to] shov[e] nicotine down [Katie's] throat, pinned [her] down on the bedroom floor and tried to rip [her] shirt off." When Katie ran outside to her

25

car to "try to call for help," Erich "pulled [her] out of the driver's seat" and she fell in "sticker burrs." Erich recalled that he was also "put in jail" on one occasion in fall 2012. And another time, C.N. tried to "break up a fight" between Erich and Katie. According to Erich, at that time, Katie was attempting to leave in her car with Z.O., but Erich felt that he had "gone . . . a longer period of time than . . . [he] should have without seeing" his child. Erich went out to the car "to unstrap [Z.O.] out of her car seat," and Katie tried to stop him. C.N. then pushed Erich and appeared scared.

Erich further testified that he has seen C.N. appear to be intimidated by Daron. And previously when C.N. lived primarily with Katie, he would bite his nails, exhibit nervous ticks, and be generally unsettled when he was going to see Daron. Moreover, Erich has observed C.N. running around the house locking doors, which initially appeared to be out of fear but now has become a routine. On "a handful" of occasions, Erich has seen Daron be verbally aggressive toward C.N. For instance, when C.N. fell off his horse at a rodeo event, Daron walked aggressively over to C.N. and began screaming and cursing. Daron also said that he was going to "kill" the horse, which caused C.N. to become withdrawn. Also, in 2013, Daron grabbed C.N. "pretty hard" and dragged him into the bathroom at a restaurant. C.N. then came out of the bathroom crying. According to Erich, Daron would not always show

up for C.N.'s football practices or games, and in Erich's opinion, Daron was resentful that Erich was participating in C.N.'s extracurricular activities.

*Father*

Daron testified that he is C.N.'s father, he is married to Danielle, and at the time of trial, Danielle was pregnant with their child. Daron and Danielle also plan on having an additional child in the future.

Daron owns a trucking company, is self-employed, and works in the oil field industry. Daron has owned his trucking company since 2011, it operates in forty-eight states, and Daron has six employees. At the time of trial, Daron had hired a certain employee so that he would no longer be required to travel out of town as frequently. In the past, Daron would spent approximately three nights a week out of town.[6]

Currently, Daron, Danielle, and C.N. live in a house in the country. Daron stated that he and Danielle have a "pretty good relationship," although they argue "[p]robably a couple times a month." Daron is not physically abusive to Danielle.

---

[6] In his First Amended Response to Katie's Request for Admissions, Daron admitted that "the only person in [his] home with [C.N.]" while Daron is working is Danielle. And in his Response to Katie's First Set of Written Interrogatories, a copy of which the trial court admitted into evidence at trial, Daron stated that he "do[es] not have a weekly work schedule." He "receives calls to haul and [he] can either take the job [himself] or assign someone to the job." "Over the past [twelve] months, [he] ha[s] worked some weekends," but his schedule varies each week.

In regard to his mental health history, Daron testified that he sees a counselor and takes "a bipolar medicine." He last saw his counselor four or five months before trial. Daron further stated that he had been diagnosed with ADHD and has taken medication for his ADHD in the past. According to Daron, he has anger management issues, but he takes medication to make him calmer.[7] And Daron, in the past, has had problems with impulse control when dealing with people.[8] Daron believes that he has his anger management issues more in control than he has in the past. However, he becomes mad if Katie calls him multiple times. When Daron is overwhelmed, he feels "stressed out." Daron consumes a "six-pack" of beer every two weeks approximately.

Related to C.N., Daron stated that after the 2012 order was entered, he saw C.N. more often than the order prescribed. However, when Daron would see C.N., who was living primarily with Katie at the time, he would notice that C.N. had poor hygiene. C.N. was not bathing, brushing his teeth, using deodorant, and could not tie his shoes. After C.N. began living primarily with Daron, he learned to do daily chores, which include feeding their animals, cleaning his room, making his bed, and

---

[7]    In his First Amended Response to Katie's Request for Admissions, Daron admitted that he takes "medication for anger management" in order to "keep calm" because he does not "handle things right." (Internal quotations omitted.) He also admitted that he takes medication for "ADD" and a "mood stabilizer."

[8]    In his First Amended Response to Katie's Request for Admissions, Daron also admitted that he has had "problems controlling [his] anger."

28

sweeping the floor. C.N.'s demeanor in Daron's home is "[g]ood" and "[a]mazing," and he is respectful. C.N. and Daron like to go "trucking" and hunting together. During the summer before trial, C.N. traveled with Daron, and he attended a basketball camp. Daron has seen improvement in C.N. since he began living primarily with him. Daron has talked to C.N. about the new baby that Daron and Danielle are expecting, and C.N. is excited to have a new sibling.

Since C.N. has been living primarily with Daron, Daron helps him with his homework when Daron is not working, but Danielle helps him with his homework "[a]ll the time." In Daron's opinion, he helps C.N. with his homework about twenty percent of the time, while Danielle helps C.N. the remaining eighty percent of the time. Currently, C.N. is in two resource classes at school and has friends, although C.N. did get into a couple of fights at school in spring 2017.

Daron further testified that he and Danielle are both responsible for seeing that C.N. takes his ADHD medication. C.N.'s behavior has improved, and he is "doing a lot better" since adjustments were made to his ADHD medication. Although C.N. is not "bad" when he is not taking his medication, a person has "to have control of him." According to Daron, when C.N. is living primarily with him, he is "fine" regardless of whether he is on ADHD medication or not. However, the ADHD medication helps C.N. listen at school. Daron noted that he and C.N. went to three counseling sessions together after C.N. began living primarily with Daron,

and the counselor that they saw said that they had "nothing really to discuss anymore" and that they were "doing great." Daron has paid for C.N.'s medical insurance since birth and plans to continue paying for it.

Related to C.N.'s extracurricular activities, in fall 2015, Daron went to a lot of C.N.'s football games, although he may have missed some practices because of work. Daron was unable to attend C.N.'s school award ceremony because he was out of town, but he attended many of C.N.'s basketball games. And Danielle attended all of C.N.'s basketball games. Since C.N. began living primarily with Daron in spring 2016, Daron has enrolled him in football and basketball. C.N. is also planning on "showing" a heifer.

In regard to the November 2015 telephone call, Daron stated that during the telephone call, he told Katie to "put that [f]'ing brat on the phone," he "threatened to put [C.N.] on his knees for three hours," and he accused C.N. of laughing.[9] According to Daron, he made the statement about having C.N. stand on his knees, as a form of discipline, in reference to an upcoming visit that C.N. was to have with Daron, but he never was actually going to do that to C.N. Daron explained that Katie had called him eleven times on the day of the November 2015 telephone call, he believed that she was "harassing" him and "setting [him] up," and Katie was the

---

[9] In his First Amended Response to Katie's Request for Admissions, Daron admitted that "during a [tele]phone call with Katie, [he] told her to 'put that fucking brat on the phone,' referring to [C.N.]"

person who initiated the November 2015 telephone call. In any event, Daron admitted that he had "made a mistake" speaking in such a manner to C.N.

Daron also explained that, at a past rodeo event, when the event was running late, he wanted to take C.N. home. Daron ended up picking C.N. up and carrying C.N. to his truck. Further, on another occasion, C.N. fell off of his horse at a rodeo event, and Daron rushed over to him and said something like that he wanted "to kill the horse," although Daron did not recall actually using the word "kill." Daron stated that he had never made disparaging remarks about C.N. in C.N.'s presence.[10]

In Daron's opinion, C.N. needed discipline, which Daron does typically by talking to him, "taking his [video] games away," and not allowing C.N. "to ride the Ranger."[11] Daron stated that, in the past, his own behavior has contributed to C.N.'s behavioral issues and he had, in the past, told Katie to "whoop [C.N.'s] ass" if she called him needing disciplinary advice. According to Daron, while C.N. lived primarily with Katie, Katie would call Daron every week and ask him to discipline C.N. over the telephone, and Katie had expressed concerns about being unable to control C.N.

---

[10]    In his First Amended Response to Katie's Request for Admissions, Daron admitted that at a football practice for C.N.'s team during fall 2015, he told Erich, "We have to knock the pussy out of this kid," while referring to C.N. (Internal quotations omitted.)

[11]    Daron stated that the "Ranger" is an "ATV" that C.N. is allowed to ride on Daron's property.

31

Daron further testified that C.N. loves Katie and has a close relationship with her. And when asked whether C.N. wants to live with Katie, Daron stated: "One minute he does, and the next minute -- it depends." C.N. "wants to make everybody happy," and he will tell Daron "what [Daron] want[s] to hear," just like he does with Katie. In Daron's opinion, C.N. likes living with Daron because C.N. appreciates the structure at Daron's house and he "has everything at [Daron's] house." And Daron believes that C.N. should continue living primarily with him. C.N. does not fear Daron, and C.N. has a bond with Daron's father, although Daron admitted that C.N. is closer with Katie's parents. Daron explained that C.N. should spend a lot of time with Katie, but "[s]he needs to step up to the plate and do her job."

In regard to Erich, Daron stated that law enforcement officers had been called regarding Erich six times.[12] And when asked whether he wanted C.N. to have a good relationship with Erich, Daron stated: "As long as he do[es not] put his hands on [C.N.] like he did."

Moreover, Daron testified that he had previously deposited $12,000 into C.N.'s custodial account to be used for C.N.'s education. And he had never signed an agreement that permitted Katie to use the funds in C.N.'s custodial account for

---

[12]  In his Responses to Katie's First Set of Written Interrogatories, when asked to "[i]dentify all occasions when the Police Department ha[d] been called to any of [his] residences since October 15, 2012," Daron stated that law enforcement officers "ha[d] not been called to [his] residence since October 15, 2012."

32

her own personal use. However, he did verbally tell her when she was unemployed that she "could take some money out" to buy furniture for C.N. and then repay it. At the time of trial, there were no funds remaining in C.N.'s custodial account, and Daron explained that he had never taken any money out of the account. Further, according to Daron, he had loaned Katie approximately $7,000 since 2012.

Daron requested that the trial court allow C.N. to remain living primarily with him, where C.N. had been living for the previous sixteen months, and that Daron be named as the joint managing conservator with the exclusive right to designate C.N.'s primary residence.

### *Father's Psychological Evaluation*

The trial court admitted into evidence at trial a copy of Daron's May 15, 2017 psychological evaluation completed by Dr. Bramlette. At that time, Daron reported that he had graduated high school and he had been the owner of "DN Trucking LLC" since 2011. Daron had nine employees and "dr[ove] a trucking route to Odessa, Texas" which caused him to be away from home one or two nights each week.

Daron denied any narcotics use or prescription medication abuse, and he reported that he "consume[d] alcohol (1-6 beers at a sitting) 1-2 times per month." Related to his mental health history, Daron reported that he had been diagnosed with ADHD as a child and "has since been prescribed various medications . . . to treat his ADHD symptoms." Daron had also "worked with a therapist . . . on an occasional

33

basis over the past five years," he attended court ordered counseling sessions with C.N. for approximately one year, and C.N. last met with Daron's counselor in September 2016.

Related to his criminal history, Daron reported that he was "charged with [a] DWI on one occasion at [the] age of [nineteen]" and he had "violated a protective order three times within a six month period in 2007." According to Daron, "he was incarcerated over[]night on the first two arrests and was incarcerated for [thirty] days on the third arrest." Daron "violated the protective order [obtained] by [Katie] by [tele]phone and by coming on to her property on one occasion." Regarding the telephone contact, Daron "said some things" to Katie that he "shouldn't have said," but his comments were "not threatening"; rather, they were "mean spirited." (Internal quotations omitted.)

In regard to Danielle, Daron reported that he and Danielle had been married for four years, and he denied "any history of assaultive fighting or related domestic violence" in their relationship. Danielle did not use narcotics or abuse alcohol. At the time of the evaluation, C.N. had been living primarily with Daron for approximately two years, and C.N. was "positively bonded" with Danielle.

Related to his previous relationship with Katie, Daron reported that they were married in 2004 and separated when C.N. was approximately two years old. He and Katie then subsequently divorced. Daron denied any history of domestic violence

in their relationship and "reported that the police were never called on a domestic disturbance related matter." According to Daron, Katie did not use narcotics or abuse prescription medication during their relationship, but he described her alcohol use as "pretty heavy" and stated that she "abus[ed] alcohol" at the time. (Internal quotations omitted.) Katie also struggled with depression and "had a history of multiple suicide attempts." Daron did not believe that Katie had been mistreating C.N. during the course of his and Katie's relationship. And Daron denied ever physically abusing Katie.

Daron further stated that after he and Katie separated, Katie "attempted to reunite with him on several occasions and cut on herself when he refused." Daron and Danielle have given Katie approximately $10,000 "so that she could obtain mental health treatment for her problems," which Katie has never repaid.

In regard to C.N., Daron explained that C.N. was "doing way better" since he began living primarily with Daron. (Internal quotations omitted.) Daron "lives on a farm" and his home is stocked with food, is fully furnished, has all utilities, and is "free from unsanitary or otherwise inappropriate living conditions." Daron reported that he was "concentrating on [C.N.'s] grades" and "his behavior ha[d] been great." (Internal quotations omitted.) Daron takes away certain privileges in order to redirect C.N.'s behavior. According to Daron, C.N. has friends, but does have "some social problems." (Internal quotations omitted.) C.N. plays basketball and plans on

"showing a [heifer] he has raised." Since he began living primarily with Daron, C.N. has attended school on a consistent basis, and he is current with his medical checkups and immunizations. Daron wants C.N. to continue living primarily with him.

Daron further admitted that C.N. is "excited to see [Katie] on weekends" and loves Katie. (Internal quotations omitted.) Daron believes that it is important for C.N. to have Katie in his life. However, Daron reported that when C.N. "returns from his weekend visits" with Katie, he has not bathed and is "dressed slovenly." Moreover, there is not a bed for C.N. at Katie's home, and C.N. has run away from Katie's home on two occasions.

The psychological evaluation notes that Daron "put forth a guarded effort on various self-report tasks" and exhibited a "non-disclosing" manner; thus, Dr. Bramlette explained that the evaluation "may [have] fail[ed] to fully capture certain aspects of [Daron's] character or psychological difficulties." However, the evaluation concludes that "[a]bsent valid collateral information indicating that [C.N.'s] current placement [with Daron] is toxic or otherwise harmful," there is no "evidence for psychopathology that would preclude [Daron] from having [C.N.] remain in his care." At the very least, C.N. "require[s] a stable home environment that is free [from] significant parenting failures." Should C.N. remain living primarily with Daron, Dr. Bramlette recommended that Daron, Danielle, and C.N. participate in family counseling sessions.

*Step-mother*

Danielle testified that she has been married to Daron for four years and is currently employed at "Project Tools" in the field of "on-line project management software." According to Danielle, Daron usually travels for work two nights a week. If C.N. is visiting with Katie over a weekend, Daron will usually do a work trip over the weekend as well. Although Danielle and Daron are expecting a baby, Danielle stated that she did not have any concerns about being able to parent C.N. and a baby at the same time.

In Danielle's opinion, she has a good relationship with C.N., as does Daron, and C.N. respects Danielle. C.N. does not exhibit fear or anxiety when he is in Daron's home. On a typical school day, C.N. "gets up to his alarm," that he has set for himself, and gets ready for school. C.N. then comes to Danielle and Daron's room to take his medicine. C.N. will also "feed his heifer in the morning" and "let the chickens out." C.N. then goes to school, and after school, he usually attends the "Boys & Girls Club." After Danielle picks him up, C.N. goes home and starts his homework while Danielle cooks dinner. Danielle helps C.N. with his homework about eighty percent of the time, while Daron helps him the remaining twenty percent of the time. After dinner, C.N. takes a shower and then goes to bed. According to Danielle, C.N. has become "pretty much independent" while living with Daron; however, when he first began living primarily with Daron in spring

2016, he could not do any of the aforementioned things. For instance, it was difficult to get C.N. up in the morning and he could not tie his shoes. Further, his backpack contained books and notebooks from a school that he had not attended in more than six months as well as food and candy. And C.N. did not initially want to do homework, but she and Daron have "just worked with him" and now it is part of his routine.

Danielle further testified that she attends C.N.'s medical appointments and C.N. currently takes his ADHD medication every morning. C.N. "always" takes his medication when he is in Daron's possession. Danielle further noted that C.N. and Daron are "always together" and Daron takes C.N. hunting with him. Daron also enrolled C.N. in football in fall 2016, but Katie would not take him to football practices when he was in her possession and C.N. was "penalized . . . for not making some of the practices" and games. C.N. did not miss any football practices when C.N. was in Daron's possession. Previously, Katie had been supportive of C.N. playing football when C.N. had been living primarily with her, but she stopped being supportive after C.N. began living primarily with Daron and did not attend any of C.N.'s football games in fall 2016. Recently, C.N. had attended basketball camp, and he has played in a basketball league while living primarily with Daron. C.N. is also involved in "4-H" events, and Danielle takes him to "4-H" meetings once a month. In the past, Daron had not attended C.N.'s "4-H" events.

Danielle also noted that she and Daron discipline C.N. by telling him to go to his room or by taking his video games away. Occasionally, they have C.N. run laps as a form of discipline so that he "get[s] a little extra workout . . . instead of just going to sit in his room." Danielle has not seen Daron use "unnecessary measures to discipline" C.N.

Related to C.N.'s school work, Danielle testified that C.N., prior to primarily living with Daron, "failed two classes" during the "first six weeks" of his fifth grade school year, "failed four [out] of . . . five classes" during both the "second six weeks" and the "third six weeks" of the school year, and "failed three [out] of . . . five classes" during the "fourth six weeks" of the school year. After beginning to primarily live with Daron in spring 2016, however, C.N. "only failed one class" during the "fifth six weeks" of the school year and only one class during the "sixth six weeks" of the school year. Danielle noted that C.N. does still struggle at school and still has behavioral issues. And in spring 2017, when C.N.'s "behavior issues started popping up again," she and Daron "sat down with [C.N.] and . . . made a behavior plan" for C.N. to follow for school, "like go sit down, face forward, don't talk to kids and between classes go straight to [his next] class." The behavior plan is taped on the wall in C.N.'s bedroom. The goal for the behavior plan is for C.N. "to start trying to figure out on his own what he needs to be doing."

In regard to the November 2015 telephone call, Danielle stated that she was not present when Daron spoke to C.N. on that day. However, she has never heard Daron speak to C.N. in that manner in the past, and Danielle agreed that Daron's threat directed toward C.N. was extreme.

Further, Danielle explained that when C.N. fell off of his horse at the rodeo event, Daron was scared and angry and ran over to C.N. and "started yelling." And Daron moved aggressively toward C.N. and the horse. Danielle did not remember whether or not Daron said he was "going to do something to the horse." In Danielle's opinion, C.N. was not able to control the horse correctly which led to him falling off. C.N. went to the hospital after falling off the horse.

In regard to C.N. and Katie's relationship, Danielle noted that C.N. misses Katie and he loves her. Danielle has heard C.N. state that he wants to live with Katie, but also that he wants to live with Daron. Danielle has seen Katie speaking negatively about Daron in C.N.'s presence. However, Danielle has not seen Erich inappropriately discipline C.N. or do anything detrimental to C.N.

Moreover, related to Katie specifically, Danielle testified that in 2014, Katie asked her and Daron for $1,900 for "medical stuff," which they gave her. Katie then asked Danielle for an additional $7,000, but told Danielle not to tell Daron that she had asked for money. Finally, Katie asked Danielle and Daron for $5,800, telling them that "it was a life or death situation," which prompted them to give Katie the

money.  Later, Danielle and Daron found out that the money had been used by Katie "for [a] spiritualist."

*School Teachers*

Christy Lynn Smith testified that she is a fifth grade reading and math resource teacher.  C.N. was a student in her resource math class in fall 2015 and a student in her resource math and reading classes in spring 2016, as C.N. had "some special needs as a student."  According to Smith, C.N. lived primarily with Katie and also with Katie's parents in fall 2015, and then C.N. began living primarily with Daron in spring 2016.  After C.N. began living primarily with Daron, he seemed more focused, was better behaved in class, and started "performing better."  Smith also stated that she would receive homework more often from C.N. after he began living primarily with Daron.  Previously, it was "hit or miss" whether or not she would receive homework back from C.N.[13]

Smith further explained that prior to living primarily with Daron, C.N. was very distracted at school, got into trouble "quite a bit," and he had "altercations with other kids in school."  C.N. did not appear to care about school; "he was just kind of there because he had to be there."  C.N. also exhibited "avoidance behavior[s]," like asking to go to the restroom and never returning to class because he was "hiding out

---

[13]    In viewing school records from C.N.'s sixth grade year at trial, Smith noted that it appeared that both Katie and Daron were helping C.N. with his homework.

in the bathroom." It did not appear that C.N. had a lot of friends in his class, and C.N. had "ups and . . . downs as far as his behavior." If there were issues with C.N. during fall 2015, Smith would contact Katie's mother because "she was easier to get in touch with."

Smith further testified that toward the end of the year, she did not see "as many issues" with C.N. If there was an issue with C.N. at school, Smith would tell him that she was going to call Daron and that would "fix it," and C.N. would redirect his behavior. Smith would also notify Daron if there had been a problem at school. In Smith's opinion, C.N.'s behavior improved after he began living primarily with Daron. Smith also testified that she does not have any concerns about C.N. being abused in Daron's care and C.N. did not appear to be fearful of Daron.

Kimberlee Rooker testified that she is a sixth grade reading and math resource teacher. C.N. was a student in her resource math and reading classes in fall 2016 and spring 2017. C.N. spent approximately half of his school day in Rooker's classes. According to Rooker, C.N. lived primarily with Daron during his sixth grade school year. C.N. came to school dressed appropriately and clean, and he was not excessively absent from class.

Rooker further explained that at the beginning of the school year, C.N. was a "[g]reat kid," did not have any problems, and did everything that she asked of him. However, throughout the year, she did see some behavioral problems. For instance,

C.N. "would get into verbal confrontations with . . . other boys in the classroom" and made "some inappropriate comments" to another classmate. However, Rooker also noted that C.N. had a few friends and was "very likable." According to Rooker, when C.N. entered the sixth grade he was reading at a second or third grade level, but by the end of the sixth grade, he was reading at a fifth grade level. Rooker noted that Danielle helped C.N. with his reading. In Rooker's opinion, C.N. bites his nails out of habit, rather than in response to a particular thing.

Rooker also explained that she met with Danielle before C.N.'s sixth grade school year and they decided that C.N. would have a "homework sheet" where he was to write down his homework for each class. Rooker expressed concern regarding one incident where she believed that Katie had actually completed C.N.'s homework for him.

In regard to parental involvement, Rooker noted that Katie would come eat lunch with C.N. at school, which made C.N. excited, and Katie attended C.N.'s end of the school year party. Rooker also spoke to Katie via text messages about C.N. and school. Daron attended the "open house" at the beginning of the school year, and Rooker spoke to Daron on the telephone a few times when she needed help redirecting C.N.'s behavior. According to Rooker, Danielle was extremely active in C.N.'s schooling, and Rooker and Danielle exchanged email correspondence, Danielle attended the "open house" and other meetings related to C.N., and she sat

43

in the classroom after C.N. had been exhibiting behavioral issues. Rooker did not have any concerns regarding C.N. being abused by Daron, and C.N. did not appear to be afraid of Daron. In Rooker's opinion, C.N. needs structure in his life.

Laura Kwiatkowski testified that she is a special education counselor for the school district where C.N. attended school in fifth and sixth grade and she is familiar with C.N.'s school records. In fifth grade, at the beginning of the year, C.N. was not doing well behaviorally or academically. He was not able to focus, sit, or give attention to his school work. He was disruptive in the classroom, did not want to do school work, and the school work was hard for him. At the time, C.N. was not taking medication for ADHD regularly which caused his behavior to be unstable.[14] According to Kwiatkowski, C.N.'s ADHD is "[p]retty severe." C.N. would get into fights with other students, did not have age-appropriate social skills, and had poor grades. During this period of time, C.N. was living primarily with Katie, and Kwiatkowski had concerns about C.N. being able to complete his school work and have consistent medical care while in Katie's possession. Kwiatkowski did speak to Katie "quite a few" times during fall 2015, and Kwiatkowski agreed that Katie "seem[ed] to be an appropriately concerned mother."

---

[14] Kwiatkowski noted that Katie had informed the school that in fall 2015, C.N. was "off [his ADHD] medication for a[]while because they were adjusting" it and he was "seeing a doctor." Kwiatkowski also explained that C.N.'s ADHD medication was changed "to a pill" rather than "a patch" because the "patch" was not being given consistently while C.N. was living primarily with Katie.

44

In Kwiatkowski's opinion, C.N. changed over the course of his fifth grade and sixth grade years. When C.N. takes his ADHD medication consistently, he is able to sit in a chair and focus and his disruptive behaviors occur less frequently. C.N. started doing his homework consistently, his grades improved, his "study skills" improved, and he was not as impulsive socially. C.N. has reported that Danielle helps him with his homework. When asked "what was the most significant change that [Kwiatkowski] saw in [C.N.] when he moved from [Katie's] home into [Daron's] home]," Kwiatkowski stated: "The ability to sit still in class, to focus on class work, to . . . make some progression with school work . . . because he [is] able to listen and focus." Kwiatkowski conceded that C.N. still failed certain classes during his sixth grade school year while he was living primarily with Daron.[15]

Kwiatkowski also noted that Katie had previously told her that Daron had been abusive in the past and verbally and physically abusive toward C.N. And Katie encouraged Kwiatkowski "to be careful in what [she] said to" Daron and not to speak with Daron altogether. However, in the interactions that she has had with Daron, Kwiatkowski did not feel that Katie's concerns had been corroborated. After C.N. began living primarily with Daron, Daron and Danielle met with Kwiatkowski to

---

[15] The record indicates that C.N. failed one class during the third six weeks of his sixth grade school year, two classes during the fourth six weeks of the school year, one class during the fifth six weeks of the school year, and one class during the sixth six weeks of the school year.

discuss goals for C.N., and Daron appeared to be interested in C.N.'s well-being at school. Kwiatkowski did not have any concerns regarding abuse of C.N. by Daron or in Daron's home. In Kwiatkowski's opinion, C.N. needs stability in his life.

In regard to the November 2015 telephone call, Kwiatkowski stated that she had heard the audio recording and she did not "feel[] that it was[] . . . abusive." Further, neither she nor law enforcement officers were concerned by what they heard on the recording. However, Kwiatkowski also agreed that C.N. sounded "[p]ossibly" distressed during the telephone call, that Daron made "a verbal threat," and that it was "an abusive threat."

*CPS Investigator*

Child Protective Services ("CPS") Investigator Latorsha Perry testified that a "[a] case was open[ed]" in November 2015 related to an allegation of "abuse or neglect" of C.N. As part of her investigation, Perry met with C.N. in February 2016, while he was still living primarily with Katie. At that time, he appeared very anxious, fearful, and withdrawn. C.N. also appeared to be "very scared of what to say" and was "watching every word he said." Perry later met with C.N. again in March 2016 "during [a] week that he was with [Daron] . . . exclusively," and he was smiling, happy, relaxed, and carefree. C.N. told Perry "about what he was wearing" and about "what he was going to do for th[at] weekend with [Daron]." According to Perry, C.N.'s "spirits w[ere] . . . lifted" and "[h]is eyes were lit up."

46

Perry also spoke with Katie during her investigation, who told her that she was "having a hard time in her relationship" with Erich, partly because of C.N.'s behavior. Katie also disclosed that "she wanted [C.N.] to be with her parents because she thought that they could . . . do a better job with him and handling him."

At the end of Perry's investigation, CPS concluded that "there was no abuse or neglect" of C.N. occurring.

*Guardian Ad Litem*

Catherine Kenjura testified that she was appointed as C.N.'s guardian ad litem in the instant case, and she met with C.N. four times. When Kenjura met with C.N., he did not appear fearful. According to Kenjura, C.N. has stated that he wanted to live with Katie, and in Kenjura's opinion, C.N. has a "strong bond" with Katie and loves her. However, Kenjura stated that, based on her investigation, she believed that Daron should have the right to designate the primary residence of C.N., although in her opinion, C.N. "should have . . . some sort of extended time with [Katie] so long as it doesn't affect his education and behavior."

In her guardian ad litem report, a copy of which the trial court admitted into evidence at trial, Kenjura stated that she met with C.N., Katie, Erich, Daron,

Danielle, Katie's parents, House,[16] Rooker, Peggy Still,[17] Kwiatkowski, Michael Murphy, and Perry "to determine what [was] in the best interest of C.N."[18]  And based on "the information provided and [her] investigation," in Kenjura's opinion, "it is in the best interest of C.N. for . . . Daron . . . to have the exclusive right to [designate] the primary residence of [C.N.], and for both Katie . . . and Daron . . . [to] remain [as] joint managing conservators" of C.N.  However, Kenjura also stated that Katie should be allowed "an extended visitation schedule of some sort, so long as reports from [C.N.'s] school show the education and behavior of C.N. [is] not [being] affected negatively by it."  Kenjura noted that her opinion was based, in part, on her conversations with Rooker, Still, and Kwiatkowski, who "indicated strongly that [C.N.'s] education and behavior ha[d] improved since . . . mov[ing] to [Daron's] residence" and that C.N. continuing to live primarily with Daron was in his best interest.  Further, "the psychological evaluations of [Katie and Daron] reinforce[d] [Kenjura's] opinion that residing in [Daron's] residence [would be] in the best interest of C.N."  And according to Kenjura, C.N. never

---

[16]    At trial, House testified that she is a friend of Katie's family.

[17]    At trial, Still testified that she is the principal of the school C.N. attended during fifth grade and sixth grade.

[18]    Although Kenjura's report also stated that she contacted Everitt, it is undisputed that Kenjura did not speak to Everitt prior to trial.  At trial, Everitt testified that she is a marriage and family counselor and C.N. and Katie had both participated in individual counseling sessions with Everitt.  Katie and Erich also attended couples counseling sessions with Everitt.

indicated to her that he was fearful or worried that he would be harmed while living with Daron.[19]

### Modification

In her second issue, Katie argues that the trial court erred in modifying the existing order in a suit affecting the parent-child relationship and naming Daron as the joint managing conservator with the exclusive right to designate C.N.'s primary residence because the evidence is factually insufficient to support the trial court's findings that there had been a material and substantial change warranting modification since the 2012 order establishing conservatorship, possession, or access and that modification was in the best interest of C.N.

Trial courts have wide discretion in determining issues of custody, control, possession, support, and visitation matters involving children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re K.R.P.*, 80 S.W.3d 669, 674 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *Turner v. Turner*, 47 S.W.3d 761, 763 (Tex.

---

19    We note that additional witnesses testified at trial on behalf of both parties. The Court has reviewed the complete record in the instant appeal, including all testimony and evidence presented to the trial court. *See* TEX. R. APP. P. 47.1, 47.4; *Sullivan v. Arguello Hope & Assocs., PLLC*, No. 03-18-00144-CV, 2018 WL 6424200, at *1 n.2 (Tex. App.—Austin Dec. 7, 2018, no pet.) (mem. op.) ("Because the parties are familiar with the facts of the case and its procedural history, we do not recite them in this opinion except as necessary to advise the parties of the Court's decision and the basic reasons for it."); *Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 625 (Tex. App.—Fort Worth 2011, pet. denied) (noting appellate court reviewed complete record).

App.—Houston [1st Dist.] 2001, no pet.). We review a trial court's order modifying the parent-child relationship for an abuse of discretion. *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see also E.T.-M. v. Tex. Dep't of Family & Protective Servs.*, No. 03-18-00622-CV, 2019 WL 988222, at *2 (Tex. App.—Austin Mar. 1, 2019, no pet.) (mem. op.) ("We review a trial court's decisions regarding conservatorship, including a determination of which conservator will have the exclusive right to establish the child primary residence, for an abuse of discretion."). We reverse a trial court's order only if we determine, from reviewing the record as a whole, that the trial court's decision was arbitrary and unreasonable or without reference to any guiding rules or principles. *Patterson v. Brist*, 236 S.W.3d 238, 239–40 (Tex. App.—Houston [1st Dist.] 2006, pet. dism'd); *Turner*, 47 S.W.3d at 763. We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.–Houston [1st Dist.] 1993, writ denied). The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *In re K.R.P.*, 80 S.W.3d at 674.

Under an abuse-of-discretion standard, legal and factual sufficiency are not independent grounds of error, but are relevant factors in assessing whether the trial

court abused its discretion. *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Stamper*, 254 S.W.3d at 542. Review in this context is two-pronged: a reviewing court determines whether the trial court (1) had sufficient information on which to exercise its discretion and (2) erred in applying its discretion. *Stamper,* 254 S.W.3d at 542; *Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied). Traditional sufficiency review comes into play under the first prong. *Stamper,* 254 S.W.3d at 542; *Zeifman*, 212 S.W.3d at 588.

To determine whether the evidence is factually sufficient to support the trial court's order, we must consider, weigh, and examine all of the evidence that supports or contradicts the fact finder's determination. *See Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Mauldin v. Clements*, 428 S.W.3d 247, 268 (Tex. App.—Houston [1st Dist.] 2014, no pet.). We may set aside an order only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Mauldin*, 428 S.W.3d at 268. When conducting a factual-sufficiency review, we must not merely substitute our judgment for that of the fact finder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Mauldin*, 428 S.W.3d at 268. In a bench trial, the trial court, as the trier of fact, is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Hatteberg v.*

*Hatteberg*, 933 S.W.2d 522, 530 (Tex. App.—Houston [1st Dist.] 1994, no writ). The trial court may choose to believe some witnesses over others. *Martinez v. Lopez*, No. 01-09-00951-CV, 2011 WL 2112806, at *3 (Tex. App.—Houston [1st Dist.] May 26, 2011, no pet.) (mem. op.).

Once the evidence is reviewed in the proper sufficiency context under the first prong, a reviewing court considers under the second prong whether the trial court erred in applying its discretion because it made an unreasonable decision. *Stamper*, 254 S.W.3d at 542; *see also Zeifman*, 212 S.W.3d at 588 ("The appellate court then proceeds to determine whether, based on the evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable."). A trial court does not abuse its discretion if some evidence supports its decision. *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Conservatorship of a child includes the day-to-day management of the child. *In re N.L.D.*, 412 S.W.3d 810, 816 (Tex. App.—Texarkana 2013, no pet.). Many decisions must be made by a parent or conservator on behalf of a child. *Id.* Sometimes more than one person shares these duties, particularly when both parents are named as joint managing conservators. *Id.* When the trial court appoints joint managing conservators, it must name the conservator who has the exclusive right to designate the primary residence of the child. TEX. FAM. CODE ANN. § 153.134; *see*

*also Smith v. Payandeh*, No. 01-18-00463-CV, 2019 WL 2528197, at \*5 (Tex. App.—Houston [1st Dist.] June 20, 2019, no pet.) (mem. op.).

A trial court may modify a conservatorship order if modification would be in the child's best interest and "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed" since the previous order. TEX. FAM. CODE ANN. § 156.101(a)(1); *Mauldin*, 428 S.W.3d at 268–69. The party seeking modification has the burden to establish these elements by a preponderance of the evidence. *Epps v. Deboise*, 537 S.W.3d 238, 245 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Zeifman*, 212 S.W.3d at 589.

### A. Material and Substantial Change

In a portion of her second issue, Katie argues that the evidence is factually insufficient to support the trial court's finding that there had been a material and substantial change warranting modification since the 2012 order establishing conservatorship, possession, or access because the "stressors that [previously] overwhelmed" Katie had been resolved, "[a]ny positive changes C.N. [has] experienced" are due to the adjustment of his ADHD medication and are not connected to Daron, and Daron's circumstances have gotten worse.

As previously noted, a trial court may modify a conservatorship order if, inter alia, "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed" since the previous order. TEX.

FAM. CODE ANN. § 156.101(a)(1). The change-in-circumstances requirement is a threshold issue for the trial court and is based on a policy of preventing constant re-litigation with respect to a child. *Smith v. Karanja*, 546 S.W.3d 734, 738 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see also In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Zeifman*, 212 S.W.3d at 595 ("The requirement of this showing serves a valid purpose of significantly limiting the trial [court's] discretion and prevents the modification statute from being unconstitutionally broad." (internal quotations omitted)).

In deciding whether a material and substantial change of circumstances has occurred, a fact finder is not confined to rigid or definite guidelines; instead, the determination is fact specific and must be made according to the circumstances as they arise. *See In re H.C.C.*, No. 01-16-00876-CV, 2017 WL 6520228, at *9 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, no pet.) (mem. op.); *Arredondo v. Betancourt*, 383 S.W.3d 730, 734–35 (Tex. App.—Houston [14th Dist.] 2012, no pet.). To demonstrate that a material and substantial change of circumstances has occurred, the evidence must show the conditions that existed at the time of the entry of the prior order as compared to the circumstances existing at the time of the trial on the petition to modify. *In re L.C.L.*, 396 S.W.3d 712, 718 (Tex. App.—Dallas 2013, no pet.). One party's allegation of a change of circumstances of the parties constitutes a judicial admission of the common element of "change of

54

circumstances" in the other party's similar pleading. *In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.); *In re L.C.L.*, 396 S.W.3d at 718. Further, an admission in a trial court pleading constitutes a judicial admission in the case in which the pleading was filed, requires no proof of the admitted fact, and authorizes the introduction of no evidence to the contrary. *In re A.E.A.*, 406 S.W.3d at 410; *In re L.C.L.*, 396 S.W.3d at 718; *see also Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) (assertion of fact in party's pleading can constitute judicial admission that may substitute for evidence that has "conclusive effect and bars the admitting party from later disputing the admitted fact"); *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980).

Although Katie argues that the evidence is factually insufficient to support the trial court's finding that there had been a material and substantial change warranting modification since the 2012 order establishing conservatorship, possession, or access, Katie, in her Petition to Modify the Parent-Child Relationship, i.e., her live pleading at the time of trial, alleged that "[t]he circumstances of the child, a conservator, or other party affected by the order to be modified ha[d] materially and substantially changed since the date of rendition of the order to be modified." *See In re A.E.A.*, 406 S.W.3d at 410; *In re L.C.L.*, 396 S.W.3d at 718. Similarly, Daron in his Counter-Petition to Modify the Parent-Child Relationship, alleged that "[t]he circumstances of the child, a conservator, or other party affected by the order to be

55

modified ha[d] materially and substantially changed since the date of rendition of the order to be modified." *See In re A.E.A.*, 406 S.W.3d at 410; *In re L.C.L.*, 396 S.W.3d at 718. Katie and Daron sought different relief in their petitions to modify the parent-child relationship; however, their modification claims contained a common essential element, i.e., each required proof of "change of circumstances." *See In re A.E.A.*, 406 S.W.3d at 410; *In re L.C.L.*, 396 S.W.3d at 718. Katie's allegation of a change of circumstances in her petition to modify constitutes a judicial admission of that same essential element in Daron's claim for modification of the parent-child relationship even though the parties did not request the same relief. *See In re L.C.L.*, 396 S.W.3d at 718–19. And Katie is precluded from asserting on appeal that the evidence is factually insufficient to support the trial court's finding that there had been a material and substantial change warranting modification since the 2012 order establishing conservatorship, possession, or access. *See In re A.L.H.*, 515 S.W.3d 60, 81 n.5 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (appellate court must overrule sufficiency challenge where party judicially admitted material and substantial circumstances had occurred in petition to modify); *Filla v. Filla*, No. 03-14-00502-CV, 2016 WL 4177236, at *5 (Tex. App.—Austin Aug. 5, 2016, pet. denied) (mem. op.) ("[W]ell-established case law provid[es] that an allegation in a pleading of a material and substantial change constitutes a judicial admission of the same element in the opposing party's claim

for modification of the previous order. . . . [And] [b]ecause [party] judicially admitted th[e] element, she is barred on appeal from challenging the sufficiency of the evidence to support it." (internal citations omitted)); *In re A.E.A.*, 406 S.W.3d at 410–11 (because party judicially admitted changed-of-circumstances element of other party's claim in his petition to modify, party barred on appeal from challenging sufficiency of evidence to support material and substantial change in circumstances).

We overrule this portion of Katie's second issue.

## B.     Best Interest of Child

In a portion of her second issue, Katie argues that the evidence is factually insufficient to support the trial court's finding that modifying the existing order in a suit affecting the parent-child relationship and naming Daron as the joint managing conservator with the exclusive right to designate C.N.'s primary residence is in the best interest of C.N. because C.N. wants to live with Katie, C.N. struggles academically and behaviorally, C.N.'s ADHD medication is the reason for any improvements with C.N.'s academics and behavior, Katie helps C.N. with his homework, C.N. does not attend counseling sessions with Everitt while he lives with Daron, Katie is married now and has lived in the same home since summer 2016, Daron's home is "a fearful place" for C.N., Daron's acts and omissions indicate that the relationship between him and C.N. is not proper, C.N. is afraid of Daron, Katie is capable of taking care of C.N. and Z.O., and Katie's relationship with Erich has

improved which has "tak[en] away a lot of the stress that was [previously] in [her] home."

The primary consideration in determining issues of conservatorship and possession of and access to a child is always the child's best interest. TEX. FAM. CODE ANN. § 153.002; *In re J.A.J.*, 243 S.W.3d 611, 614 (Tex. 2008); *In re K.R.P.*, 80 S.W.3d at 674; *see also Smith*, 2019 WL 2528197, at *5 (best interest of child primary consideration when determining which joint conservator will have exclusive right to designate primary residence of child). It is presumed that the prompt and permanent placement of a child in a safe environment is in his best interest. TEX. FAM. CODE ANN. § 263.307(a); *Monroe v. Alternatives in Motion*, 234 S.W.3d 56, 66–67 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

In determining the best interest of a child, we may consider the following non-exhaustive list of factors, including: (1) the child's desires; (2) the current and future physical and emotional needs of the child; (3) the current and future emotional and physical danger to the child; (4) the parental abilities of the parties seeking custody of the child; (5) whether programs are available to assist those parties to promote the best interest of the child; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d

367, 371–72 (Tex. 1976); *Epps*, 537 S.W.3d at 247; *In re Marriage of Bertram*, 981 S.W.2d 820, 822–23 (Tex. App.—Texarkana 1998, no pet.). We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *Rolle v. Hardy*, 527 S.W.3d 405, 419 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Proof of best interest is not limited to these factors, nor do all factors always apply in every case. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re P.H.R.*, No. 01-14-00101-CV, 2014 WL 7474207, at *5 (Tex. App.—Houston [1st Dist.] Dec. 30, 2014, no pet.) (mem. op.). Further, the presence of a single factor may, in some instances, be adequate to support a best-interest finding. *M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied); *see also Smith*, 2019 WL 2528197, at *6. The trial court is in the best position to observe the witnesses and their demeanor and, therefore, is given great latitude in determining the best interest of the child. *In re S.N.Z.*, 421 S.W.3d 899, 909 (Tex. App.—Dallas 2014, pet. denied); *see also Zeifman*, 212 S.W.3d at 587 (trial court is vested with discretion because it is best able to observe witnesses' demeanor and personalities); *Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes

their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

Katie asserts that the evidence is factually insufficient to support the trial court's finding that modifying the 2012 order in a suit affecting the parent-child relationship and naming Daron as the joint managing conservator with the exclusive right to designate C.N.'s primary residence is in the best interest of C.N. However, the following evidence was presented at trial and supports the trial court's finding.

C.N., who suffers from severe ADHD, requires structure, stability, and a "home environment that is free [from] significant parenting failures." Daron owns a trucking company and is self-employed. *See Smith*, 2019 WL 2528197, at *6 (parent employed). Although Daron does travel for work, he has made arrangements so that he is no longer required to travel as frequently. He also lives with his wife, Danielle, in a house in the country. *See In re S.G.C.-G.*, No. 05-18-00223-CV, 2019 WL 1856621, at *7 (Tex. App.—Dallas Apr. 25, 2019, no pet.) (mem. op.) (parent in stable relationship); *E.T.-M.*, 2019 WL 988222, at *3 (parent provided stable home for child). Danielle is employed in the field of "on-line project management software." And there is no evidence that Daron and Danielle have an abusive relationship or that there is domestic violence in the home. Daron does not use narcotics and does not abuse alcohol or prescription medication.

C.N. has been living primarily with Daron and Danielle since spring 2016. Daron and Danielle were expecting a baby at the time of trial, which C.N. was excited about. Danielle did not have any concerns about being able to parent C.N. and a baby at the same time.

While living primarily with Daron, C.N. completes daily chores, which include feeding the family's animals, cleaning his room, making his bed, and sweeping the floor. *See In re S.G.C.-G.*, 2019 WL 1856621, at *7 (child taught skills in home and had become more responsible while living with parent). On a typical school day, C.N. "gets up to his alarm" that he has set for himself and gets ready for school. He then takes his ADHD medication, "feed[s] his heifer," "let[s] the chickens out," and goes to school. After school, he attends the "Boys & Girls Club," goes home, and starts working on his homework while Danielle cooks dinner. After dinner, C.N. showers and goes to bed.

C.N.'s demeanor in Daron's home is "[g]ood" and "[a]mazing," and he is respectful. While in Daron's care, C.N. has appeared smiling, happy, relaxed, and carefree. *See In re S.G.C.-G.*, 2019 WL 1856621, at *7 (child happy in home with parent). And he has become "pretty much independent." According to Daron, C.N. likes living with him, appreciates the structure, and "has everything at [Daron's] house." Daron's home is fully furnished, is stocked with food, has working utilities, and is "free from unsanitary or otherwise inappropriate living conditions." *E.T.-M.*,

61

2019 WL 988222, at *3 (parent meeting child's needs). Daron and C.N. like to go "trucking" and hunting together; they are "always together." *See Strong v. Strong*, 350 S.W.3d 759, 767–68 (Tex. App.—Dallas 2011, pet. denied) (parent and child engaged in activities together). C.N. does not exhibit fear or anxiety when he is in Daron's home.

While C.N. has been living primarily with Daron, both Daron and Danielle have ensured that C.N. takes his ADHD medication. C.N. "always" takes his medication when he is at Daron's house. Daron also has paid for C.N.'s medical insurance since C.N.'s birth and plans to continue to pay for it. Danielle attends C.N.'s medical appointments. Daron and C.N. have attended some counseling sessions together since C.N. began living primarily with Daron. And Daron has attended individual counseling sessions. At the time of trial, C.N. was current on his medical checkups and immunizations.

In regard to C.N.'s interests, Daron was involved in C.N.'s extracurricular activities both before and after C.N. began living primarily with him. Daron attends C.N.'s football and basketball games when he is not working, and Danielle has attended all of C.N.'s basketball games. While C.N. has been living primarily with Daron, Daron has enrolled him in football and basketball, and C.N. plans to show a heifer. *See In re Marriage of Hall Oller*, No. 12-18-00109-CV, 2019 WL 968527, at *3–5 (Tex. App.—Tyler Feb. 28, 2019, no pet.) (mem. op.) (parent involved in

child's activities); *Strong*, 350 S.W.3d at 767–68. Danielle takes C.N. to "4-H events" and meetings.

Related to school, Daron and Danielle both help C.N. with his homework, and Daron has been "concentrating on [C.N.'s] grades" since C.N. began living primarily with him. *See Strong*, 350 S.W.3d at 767–68 (parent helped child with homework and worked with child to improve grades). Danielle has also helped C.N. with his reading, and C.N.'s reading level has improved while he has been living primarily with Daron. Additionally, C.N.'s grades have improved, he has been more focused in class, and he has been better behaved in class. C.N. also completes his homework more often. *See E.T.-M.*, 2019 WL 988222, at *3 (child doing well in parent's care); *In re Marriage of Hall Oller*, 2019 WL 968527, at *3–5 (child progressing in school while living with parent). If C.N. ever has an issue at school, Daron is notified, and C.N.'s teachers have spoken to Daron on the telephone when they have needed help redirecting C.N.'s behavior. While living primarily with Daron, C.N. has arrived at school dressed appropriately and clean, and C.N. has not been excessively absent from class. When C.N. began exhibiting behavioral issues more frequently at school, Daron and Danielle "sat down with him and . . . made a behavior plan" for C.N. to follow for school, "like go sit down, face forward, don't talk to kids and between classes go straight to [his next] class." The behavior plan is taped on the

wall in C.N.'s bedroom, and the purpose of the behavior plan is for C.N. "to start trying to figure out on his own what he needs to be doing."

Further, Daron and Danielle have both attended school functions and meetings. And Danielle has exchanged email correspondence with C.N.'s teacher and sat in the classroom when C.N. has had behavioral issues. Daron appears to be interested in C.N.'s well-being at school, and both Daron and Danielle have met with C.N.'s special education counselor to discuss goals for C.N. *See In re Marriage of Hall Oller*, 2019 WL 968527, at *3–5 (parent involved in child's education).

In regard to discipline, Daron disciplines C.N. by "taking his [video] games away" and not allowing C.N. "to ride the Ranger."[20] In other words, Daron takes away certain privileges from C.N. in order to redirect his behavior. Occasionally, C.N. runs laps as a form of discipline so that he can "get a little extra workout . . . instead of just going to sit in his room." Danielle has not seen Daron use "unnecessary measures to discipline" C.N.

In Daron's opinion, he and C.N. have a bond and C.N. is also bonded with Danielle. C.N. has a good relationship with both Daron and Danielle, and C.N. respects Danielle. *See In re S.G.C.-G.*, 2019 WL 1856621, at *7 (child had good relationship with step-parent also living in home); *Ceniseros v. Rychlik*, No. 03-17-00532-CV, 2018 WL 4265679, at *5–6 (Tex. App.—Dallas Sept. 7, 2018, no

---

[20] The "Ranger" is an "ATV" that C.N. is allowed to ride on Daron's property.

pet.) (mem. op.) (step-parent assists in caring for children and gets along with children). Several witnesses noted that they did not have concerns that C.N. was being abused by Daron or in Daron's home and that C.N. did not appear to be afraid of Daron. A CPS investigation concluded that "there was no abuse or neglect" of C.N. occurring.

Katie argues that naming Daron as the joint managing conservator with the exclusive right to designate C.N.'s primary residence is not in the best interest of C.N. because C.N. wants to live with Katie, C.N. was "traumatized [as a] child[] partly because of the domestic violence [that] he had seen between Katie and Daron," Daron verbally abuses C.N., C.N.'s ADHD medication is the reason for any improvements with C.N.'s academics and behavior, Katie helps C.N. with his homework, Daron does not help with C.N.'s homework very often, Daron travels for work a lot, C.N. has not frequently attended counseling sessions while living primarily with Daron, Katie is married now and has lived in the same home since summer 2016, Daron's home is "a fearful place" for C.N., Daron's acts and omissions indicate that the relationship between him and C.N. is not proper, C.N. is afraid of Daron and appears stressed when he is about to see Daron, Katie is capable of taking care of C.N. and Z.O., and Katie's relationship with Erich has improved which has "tak[en] away a lot of the stress that was [previously] in [her] home."

The trial court heard evidence that neither Katie nor Daron is the perfect parent and that they both have had lapses in their parenting judgments and abilities. *See In re Rodriguez*, 940 S.W.2d 265, 271 (Tex. App.—San Antonio 1997, writ denied) (parent, although not perfect, may still be "a fit . . . parent"). Notably, in a bench trial, the trial court, as the trier of fact, is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, and may accept or reject all or any part of their testimony. *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also Townsend v. Vasquez*, 569 S.W.3d 796, 810–11 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (because trial court sole judge of witness credibility in bench trial, court entitled to believe or not believe evidence that child was afraid of parent); *Ceniseros*, 2018 WL 4265679, at *6 ("Conservatorship determinations are intensely fact driven, and the trial court is in the best position to judge the credibility of the witnesses and the weight to be given their testimony."); *In re De La Pena*, 999 S.W.2d 521, 529 (Tex. App.—El Paso 1999, no pet.) (given the nature of custody disputes, "[a]ppellate courts routinely defer to the fact finder at trial concerning matters of credibility and demeanor" because "in no other type of litigation is it more critical"). The trial court is best able "to observe the demeanor and personalities of the witnesses and [to] 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no

pet.); *see also Ziefman*, 212 S.W.3d at 587 (trial court is "wisely vested with . . . discretion" regarding modification of conservatorship because it "is best able to observe the witnesses' demeanor and personalities"); *In re De La Pena*, 999 S.W.2d at 529 ("The child's behavior, experiences, fears, joys, and significant attachments will be conveyed through pictures and through the words of . . . witnesses[] . . . . The individuals vying for conservatorship may be scrutinized by the fact finder for such intangible signs as an animated smile when describing a child's achievements, a furrowed brow when explaining typical affectionate concern, or even tears when anticipating the emotional impact the outcome of litigation will have on a child.").

Further, when there is conflicting evidence presented at trial it is the province of the fact finder to resolve such conflicts. *Jordan*, 325 S.W.3d at 713. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume that it did so in favor of the prevailing party. *Jordan*, 325 S.W.3d at 713; *see also Ceniseros*, 2018 WL 4265679, at *3. It is not within the province of this Court to interfere with the fact finder's resolution of conflicts in the evidence. *In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 81 (Tex. App.—San Antonio 2011, pet. denied); *see also In re J.H.C.*, No. 11-17-00187-CV, 2019 WL 2557542, at *8 (Tex. App.—Eastland June 20, 2019, no pet.) (mem. op.) ("We recognize that there was also evidence that [other parent]

loved the children, that they loved him, and that [parent] was a good [parent]. . . . However, it was the role of the trial court to resolve the conflicts in the evidence . . . .").

Finally, we note that although the trial court's interview with C.N. was not recorded, the trial court was aware of C.N.'s desires when it found that naming Daron as the joint managing conservator with the exclusive right to designate C.N.'s primary residence is in the best interest of C.N. *See In re K.K.R.*, No. 04-18-00250-CV, 2019 WL 451761, at *5 (Tex. App.—San Antonio Feb. 6, 2019, no pet.) (mem. op.). And where we only have a partial record of the trial proceedings, we presume that the omitted portions support the trial court's ruling. *See Long v. Long*, 144 S.W.3d 64, 69 (Tex. App.—El Paso 2004, no pet.) (where trial court interviewed children in chambers, but no record of conversation was made, appellate court "must presume facts existed that allowed the trial [court] to find that a change in the [children's] primary residence was in their best interest"); *Voros v. Turnage*, 856 S.W.2d 759, 762–63 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (where complaining party failed to request a record of a child's interview, reviewing court will presume evidence from interview supports trial court's findings). Further, even if a minor child has expressed a desire to live with a specific parent, the ultimate decision of which parent should be named as the joint managing conservator with the exclusive right to designate the child's primary

68

residence is left in the sound discretion of the trial court. *See In re Bennett*, No. 12-18-00149-CV, 2018 WL 4199995, at *4 (Tex. App.—Tyler Aug. 31, 2018, orig. proceeding [mand. denied]); *Echols*, 85 S.W.3d at 477.

Based on the foregoing and after considering all of the evidence, we conclude that the evidence is factually sufficient to support the trial court's finding that modifying the existing order in a suit affecting the parent-child relationship and naming Daron as the joint managing conservator with the exclusive right to designate C.N.'s primary residence is in the best interest of C.N.

We overrule this portion of Katie's second issue.

Further, we hold that the record contains sufficient evidence for the trial court to have exercised its discretion to appoint Daron as the joint managing conservator with the exclusive right to designate C.N.'s primary residence, and the trial court's decision was reasonable. *See Strong*, 350 S.W.3d at 764–68 (holding, although some evidence favored one parent, there was evidence sufficient to support award of primary custody to other parent).

## Guardian Ad Litem

In her first issue, Katie argues that the trial court erred in relying on Kenjura's testimony and her guardian ad litem report because she, as a guardian ad litem, did not properly discharge her duties as set forth in Texas Family Code section 107.002. *See* TEX. FAM. CODE ANN. § 107.002.

Texas Family Code section 107.002, titled "Powers and Duties of Guardian ad Litem for Child," provides, in part:

(a)  A guardian ad litem appointed for a child under this chapter is not a party to the suit but may:

> (1)  conduct an investigation to the extent that the guardian ad litem considers necessary to determine the best interests of the child; . . .
>
> . . . .

(b)  A guardian ad litem appointed for the child under this chapter shall:

> (1)  within a reasonable time after the appointment, interview:
>
> > (A)  the child in a developmentally appropriate manner, if the child is four years of age or older;
> >
> > (B)  each person who has significant knowledge of the child's history and condition, including educators, child welfare service providers, and any foster parent of the child; and
> >
> > (C)  the parties to the suit;
>
> (2)  seek to elicit in a developmentally appropriate manner the child's expressed objectives;
>
> (3)  consider the child's expressed objectives without being bound by those objectives;
>
> . . . .
>
> (5)  perform any specific task directed by the court.
>
> . . . .

70

(c)     A guardian ad litem appointed for the child under this chapter is entitled to:

        (1)     receive a copy of each pleading or other paper filed with the court in the case in which the guardian ad litem is appointed;

        (2)     receive notice of each hearing in the case;

        . . . .

        (4)     attend all legal proceedings in the case but may not call or question a witness or otherwise provide legal services unless the guardian ad litem is a licensed attorney who has been appointed in the dual role;

        (5)     review and sign, or decline to sign, an agreed order affecting the child;

        (6)     explain the basis for the guardian ad litem's opposition to the agreed order if the guardian ad litem does not agree to the terms of a proposed order;

        (7)     have access to the child in the child's placement; [and]

        (8)     be consulted and provide comments on decisions regarding placement . . . [.]

. . . .

(e)     Unless the guardian ad litem is an attorney who has been appointed in the dual role and subject to the Texas Rules of Evidence, the court shall ensure in a hearing or in a trial on the merits that a guardian ad litem has an opportunity to testify regarding, and is permitted to submit a report regarding, the guardian ad litem's recommendations relating to:

        (1)     the best interests of the child; and

        (2)     the bases for the guardian ad litem's recommendations.

*See id.* § 107.002(a), (b), (c), (e).

Here, Katie argues that Kenjura did not properly discharge her duties as a guardian ad litem because she examined witnesses at trial, did not have "a substantive conversation with . . . Everitt, C.N.'s counselor of seven years, prior to filing her report" with the trial court, relied too heavily on the observations of C.N.'s teachers and school counselor, and was not diligent in her questioning of C.N. (Emphasis omitted.)

To the extent that Katie complains on appeal that Kenjura improperly questioned witnesses at trial,[21] Kenjura, on at least fifteen occasions during trial, questioned witnesses without objection from any party. To preserve a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion and the trial court either ruled on the party's request, objection, or motion, or refused to rule, and the party objected to that refusal. TEX. R. APP. P. 33.1(a). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991); *see also*

---

[21] *See* TEX. FAM. CODE ANN. § 107.002(c)(4) ("A guardian ad litem appointed for the child . . . is entitled to . . . attend all legal proceedings in the case *but may not call or question a witness or otherwise provide legal services unless the guardian ad litem is a licensed attorney who has been appointed in the dual role*." (emphasis added)); *Goodyear Dunlop Tires N. Am., Ltd v. Gamez*, 151 S.W.3d 574, 583 n.7 (Tex. App.—San Antonio 2004, no pet.) (differentiating between amicus attorneys, attorneys ad litem, and guardians ad litem in suits affecting the parent-child relationship).

*Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007) (by failing to object, party did not preserve error that opposing party improperly cross-examined witness).

Further, at trial, Katie's counsel specifically stated, in regard to Kenjura's ability to question witnesses at trial: "I mean, she can ask questions. . . . A guardian ad litem often doesn't. But she has a right to ask questions." A party may not complain on appeal of error that she has invited. *See Ramirez v. State*, 973 S.W.2d 388, 392 (Tex. App.—El Paso 1998, no pet.); *Evans v. Covington*, 795 S.W.2d 806, 809 (Tex. App.—Texarkana 1990, no writ); *see also Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861–62 (Tex. 2005); *Kelly v. Cunningham*, 848 S.W.2d 370, 371 (Tex. App.—Houston [1st Dist.] 1993, no writ) ("A party may not lead a trial court into error and then complain about it on appeal.").

Accordingly, we hold that Katie did not preserve for our review her complaint that the trial court erred in relying on Kenjura's testimony and her guardian ad litem report because Kenjura did not properly discharge her duties as a guardian ad litem by examining witnesses at trial. *See* TEX. FAM. CODE ANN. § 107.002(c)(4).

In regard to her complaint on appeal that Kenjura did not speak to Everitt prior to submitting her guardian ad litem report to the trial court, at trial, when the court was presented with Katie's concern that Kenjura did not speak to Everitt in connection with the guardian ad litem report, Katie's counsel stated:

73

[A]lthough it's regrettable, . . . I would suggest [that the trial court] direct [Kenjura] to visit with . . . Everitt in the jury room and she can learn more.

. . . .

I would just suggest . . . to direct [Kenjura] to talk to . . . Everitt in the privacy of the jury room, which she can do, clearly she has the authority to do that, and see if she can ascertain the concerns that she has that we want to put up here in front of the [trial court].

. . . .

And I wasn't trying to cast aspersions on . . . Kenjura. All I am saying is it's just regrettable the contact didn't happen. I mean, that's all I'm saying. So, I just suggest [that] we take a short . . . break and let [Kenjura] talk to [Everitt].

The parties, Kenjura, and the trial court agreed at trial to have Kenjura and Everitt speak during a break. Katie did not object to Kenjura's failure to speak with Everitt before submitting her guardian ad litem report to the trial court, and Katie is the party who actually requested that Kenjura and Everitt speak separately at trial. *See* TEX. R. APP. P. 33.1(a); *Bushell*, 803 S.W.2d at 712; *see also Neasbitt v. Warren*, 22 S.W.3d 107, 112 (Tex. App.—Fort Worth 2000, no pet.) ("It is elementary that a party may not 'invite' error by requesting that the trial court take [a] specific action and then complain on appeal that the trial court erred in granting the request."); *Kelly*, 848 S.W.2d at 371. Moreover, Katie actually offered Kenjura's guardian ad litem report, Movant's Exhibit 53, into evidence at trial, which the trial court then admitted without objection. *See In re M.E.C.*, 66 S.W.3d 449, 455–56 (Tex. App.—

74

Waco 2001, no pet.) (because party offered exhibits into evidence, he could not complain that their admission was erroneous); *see also Kelly*, 848 S.W.2d at 371; *Evans*, 795 S.W.2d at 808–09. And any complaint by Katie that the trial court erred in relying on Kenjura's testimony and her guardian ad litem report because she did not speak to Everitt until after trial had begun, goes to the weight of the evidence, not to the admissibility of Kenjura's testimony or report. *See In re J.H.M.*, No. 07-07-0109-CV, 2009 WL 5174364, at \*14 (Tex. App.—Amarillo Dec. 29, 2009, no pet.) (mem. op.). In a bench trial, the trial court, as the trier of fact, is the sole judge of the weight and credibility of the evidence. *See In re F.M. III*, No. 04-16-00516-CV, 2017 WL 393610, at \*4 (Tex. App.—San Antonio Jan. 30, 2017, no pet.) (mem. op.); *Hatteberg*, 933 S.W.2d at 530. And Katie was given an opportunity to question Kenjura as to why she did not consult with Everitt when Katie called Kenjura as a witness at trial.[22]

Based on the foregoing, we hold that Katie did not preserve for our review, or may not raise on appeal, her complaint that the trial court erred in relying on Kenjura's testimony and her guardian ad litem report because Kenjura did not have "a substantive conversation with . . . Everitt, C.N.'s counselor of seven years, prior

---

[22] Katie also called Everitt to testify at trial; thus, the trial court had before it Everitt's testimony when it modified the 2012 order, appointed Katie and Daron as joint managing conservators, and named Daron as the joint managing conservator with the exclusive right to designate the primary residence of C.N.

to filing her report" with the trial court. (Emphasis omitted.) Further, to the extent that Katie may raise her complaint on appeal, we hold that the trial court did not err in relying on Kenjura's testimony and her guardian ad litem report even if Kenjura did not have "a substantive conversation with . . . Everitt, C.N.'s counselor of seven years, prior to filing her report" with the trial court. (Emphasis omitted.)

Katie next complains that Kenjura, in recommending that Daron have the exclusive right to designate the primary residence of C.N., relied too heavily on the observations of C.N.'s teachers and school counselor and was not diligent in her questioning of C.N. Texas Family Code section 107.002 provides that a guardian ad litem may conduct an investigation to the extent that she considers necessary to determine the best interest of the child. *See* TEX. FAM. CODE ANN. § 107.002(a). Further, the guardian ad litem, "within a reasonable time after being appointed," shall interview "the child in a developmentally appropriate manner, if the child is four years of age or older," "each person who has significant knowledge of the child's history and condition, including educators," and "the parties to the suit." *See id.* § 107.002(b).

In her guardian ad litem report, which Katie offered into evidence at trial and the trial court admitted without objection, Kenjura stated that she interviewed C.N., Katie, Erich, Daron, Danielle, Katie's parents, House, Rooker, Still, Kwiatkowski,

76

Murphy, and Perry.[23] Further, Kenjura's time sheet, also offered into evidence by Katie at trial and admitted by the trial court without objection, indicates that Kenjura met with or spoke with the above listed individuals and the length of each of her interviews. At trial, Kenjura testified that she met with C.N. "[a]t least four [times]," for a total of approximately four or five hours. She also confirmed that she had "some kind of conversation . . . either in person or by telephone . . . about [C.N.] and how he[] [was] doing" with the individuals listed on her report.

Even a guardian ad litem who does not follow all of the requirements as set out in Texas Family Code section 107.002 is not prohibited from giving her opinion either through oral testimony or a guardian ad litem report regarding the best interest of the child. *See In re J.H.M.*, 2009 WL 5174364, at *14. Here, Kenjura conducted an investigation to the extent that she considered necessary to determine the best interest of C.N., and in doing so, she interviewed C.N., persons with "significant knowledge of [C.N.'s] history and condition, including educators," and Katie and Daron. *See* TEX. FAM. CODE ANN. § 107.002(b). Kenjura stated in her guardian ad litem report that she, "[b]ased on the information provided and [her] investigation," believed that it was in the best interest of C.N. for Katie and Daron to be named joint

---

[23] Although Kenjura's report also stated that she contacted Everitt "to determine what [was] in the best interest of C.N.," it is undisputed that Kenjura did not speak to Everitt prior to trial. Kenjura did testify that she read Everitt's prior testimony in the case before trial and before filing her report with the trial court.

managing conservators and for Daron to have the exclusive right to designate the primary residence of C.N.  Although Kenjura based her recommendation, in part, on her conversations with C.N.'s teachers and school counselor, she specifically stated that her opinion was not solely based on those conversations.  Further, Kenjura indicates that "[i]n all of [her] conversations with C.N.," he never indicated that he was "fearful or worried of harm in the residence of [Daron]."

To the extent that Katie asserts that Kenjura relied too heavily on the observations of C.N.'s teachers and school counselor and was not diligent in her questioning of C.N., her complaints go to the weight of the evidence, rather than to the admissibility of Kenjura's testimony or her guardian ad litem report.  *See In re J.H.M.*, 2009 WL 5174364, at *14.  In a bench trial, the trial court, as the trier of fact, is the sole judge of the weight and credibility of the evidence.  *See In re F.M. III*, 2017 WL 393610, at *4; *Hatteberg*, 933 S.W.2d at 530.  Accordingly, we hold that the trial court did not err in relying on Kenjura's testimony and her guardian ad litem report because she purportedly relied too heavily on the observations of C.N.'s teachers and school counselor and was not diligent in her questioning of C.N.

We overrule Katie's first issue.

## Disclosure of Identity

In her third issue, Katie argues that the trial court erred in failing to disclose its identity when conferring with C.N. because C.N. was not given an opportunity to

78

"express[] his opinions, beliefs, and fears" to the trial court, as he did not know to whom he was speaking when the trial court met with him. Thus, C.N. could not give his honest opinion or be forthcoming with the trial court. *See* TEX. FAM. CODE ANN. § 153.009.

As previously noted, there is not a record of the trial court's interview with C.N. because none was requested. *See id.* § 153.009(f) ("On motion of a party, the amicus attorney, or the attorney ad litem for the child, or on the court's own motion, the court shall cause a record of the interview to be made when the child is 12 years of age or older."). To support her position that the trial court did not disclose its identity to C.N., Katie directs this Court to statements made by the trial court and Kenjura at a non-evidentiary status hearing after the trial court had entered its order modifying the 2012 order in a suit affecting the parent-child relationship. However, for purposes of this opinion, we will presume that the trial court did not disclose its identity to C.N. when interviewing him pursuant to Texas Family Code section 153.009. *See id.* § 153.009(a).

Texas Family Code section 153.009, titled "Interview of Child in Chambers," provides, in part:

> In a nonjury trial or at a hearing, on the application of a party, the amicus attorney, or the attorney ad litem for the child, the court shall interview in chambers a child 12 years of age or older and may interview in chambers a child under 12 years of age to determine the child's wishes as to conservatorship or as to the person who shall have the exclusive right to [designate] the child's primary residence.

79

*Id.* § 153.009(a). Further, section 153.009(b) states:

> In a nonjury trial or at a hearing, on the application of a party, the amicus attorney, or the attorney ad litem for the child or on the court's own motion, the court may interview the child in chambers to determine the child's wishes as to possession, access, or any other issue in the suit affecting the parent-child relationship.

*Id.* § 153.009(b). Notably, the interviewing of a child does not diminish the trial court's discretion in determining the best interest of the child. *Id.* § 153.009(c); *see also In re Bennett*, 2018 WL 4199995, at *4; *Echols*, 85 S.W.3d at 477.

Before trial, Katie filed a Motion for Judge to Confer with the Child, asserting that C.N. was twelve years old and the issues of conservatorship, right to designate the primary residence, and possession and access of C.N. were contested; thus, Katie requested that the trial court confer with C.N. to determine his wishes as to the issues listed above. Katie specifically requested that the interview *not* be recorded.

At the beginning of trial, Katie's counsel, related to Katie's motion to confer, stated:

> Given the child's age, we think it's required. It's not discretionary.
>
> . . . Kenjura has confirmed that [C.N.] loves both of his parents and it's a very stressful situation for him. And we think he probably wants to please both parents and this is difficult for him.
>
> *We would like the [trial] [c]ourt to implement whatever measures [it] deem[s] appropriate, . . . to put him in a comfortable atmosphere.* Although everybody wants a decision and sometime soon, certainly before -- like this month or so, we will just leave it to [the court] to determine whether to have him come here at the end of the testimony,

80

but, also, if it's possible for the [c]ourt to, huh, confer with [C.N.] in a more comfortable environment. And we just kind of tossed out something like having a milkshake at Must Be Heaven or something, on a different day like if [the court] took it under advisement until [the court] talk[s] to him, we would have no objection to it. We just want to make sure [that C.N.] doesn't feel intimidated or pressured and he can just speak his heart.

And, so -- and, of course, this might be prematurely talking about this, because we think it would be best for [the court] to talk to him after the presentation of all the other evidence so [the court] can better frame any issues [it] might have with the conversation with [C.N.].

(Emphasis added.)

Notably, Katie's counsel specifically stated that Katie "would like the [trial] [c]ourt to implement whatever measures [it] deem[ed] appropriate," including having the trial court interview C.N. outside of the courthouse to ensure that C.N. was "in a comfortable atmosphere," did not feel "intimidated or pressured," and could "speak his heart." Throughout trial, Katie elicited testimony from numerous witnesses regarding C.N.'s distrust and fear of the judges, attorneys, and the judicial system in general based on his past experiences. And, at the conclusion of trial, the court explained, regarding its meeting with C.N.:

Of course, his anxiety about judges has been testified to and documented. So, what [the trial court is] looking for is kind of a contravening [sic], you know, noncarious [sic] way to meet with him. That's what [the court] would like to do for his sake so he's a lot more comfortable talking to [the court]. And if he's already got some rapport with . . . Kenjura, [the court] was going to have her facilitate that meeting. She doesn't have to be present and involved in it, but [the court] was going to have her facilitate the meeting to begin that conversation.

81

Katie raised no objection to the trial court's plan for its interview with C.N. As previously explained, a party may not complain of error which she has invited. *See Ramirez*, 973 S.W.2d at 392; *Evans*, 795 S.W.2d at 809; *see also Neasbitt*, 22 S.W.3d at 112 ("It is elementary that a party may not 'invite' error by requesting that the trial court take [a] specific action and then complain on appeal that the trial court erred in granting the request."); *Kelly*, 848 S.W.2d at 371 ("A party may not lead a trial court into error and then complain about it on appeal.").

Further, the trial court is given wide discretion in determining issues of custody, control, possession, support, and visitation matters involving children. *Gillespie*, 644 S.W.2d at 451; *In re K.R.P.*, 80 S.W.3d at 674; *Turner*, 47 S.W.3d at 763; *see also In re C.B.*, No. 13-11-00472-CV, 2012 WL 3139866, at *1 (Tex. App.—Corpus Christi Aug. 2, 2012, no pet.) (mem. op.) ("In determining which joint managing conservator will have the exclusive right to establish the primary residence of the child[], the trial court is vested with broad discretion."). This discretion extends to and includes the trial court's ability to determine how best to conduct its interview of a child under Texas Family Code section 153.009(a). *See* TEX. FAM. CODE ANN. § 153.009(c) ("Interviewing a child does not diminish the discretion of the court in determining the best interests of the child."), (e) (trial court *may* permit attorney for party, amicus attorney, attorney ad litem, or guardian ad litem to be present at interview); *In re N.W.*, No. 02-12-00057-CV, 2013 WL

82

5302716, at *8–10 (Tex. App.—Fort Worth Sept. 19, 2013, no pet.) (mem. op.) (trial court had discretion to deny request for interview because it was not filed until day before final hearing); *In re A.C.*, 387 S.W.3d 673, 676–78 (Tex. App.—Amarillo 2012, pet. denied) (noting trial court's wide discretion in matters pertaining to children, including its discretion to either take into account information learned at interview or to ignore it entirely); *In re C.B.*, 2012 WL 3139866, at *7 ("[I]n light of the trial court's statements that an interview in chambers would not assist the court in making the decision based on what it had already heard, we conclude that the trial court's refusal to interview [the child] was consistent with the discretion recognized in subsection (c) of [Texas] [F]amily [C]ode section 153.009."); *In re J.G.M.*, No. 9-11-00368-CV, 2012 WL 1951119, at *3 (Tex. App.—Beaumont May 13, 2012, no pet.) (mem. op.) (trial court had discretion to deny request to interview child where it determined motion untimely and made for purpose of delay); *Davis v. Davis*, No. 13-01-707-CV, 2003 WL 21355239, at *4 (Tex. App.—Corpus Christi June 12, 2003, no pet.) (mem. op.) (within trial court's discretion to interview child without first determining child's competency). A trial court abuses its discretion when it acts arbitrarily and unreasonably or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Patterson*, 236 S.W.3d at 240; *Turner*, 47 S.W.3d at 763. Moreover, an appellate court may not reverse for abuse of discretion merely because it disagrees

with a decision of the trial court, if that decision was within the trial court's discretionary authority. *Downer*, 701 S.W.2d at 242.

Although section 153.009(a) requires a trial court, on the application of a party, to interview a child twelve years or older regarding the child's wishes as to the person who shall have the exclusive right to designate the child's primary residence, the only limitation that section 153.009(a) puts on the trial court in terms of conducting that interview is that the court shall conduct the interview in chambers.[24] *See* TEX. FAM. CODE ANN. § 153.009(a); *In re McPeak*, 525 S.W.3d 310, 315–16 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also In re A.C.*, 387 S.W.3d at 676–78 ("Nothing in the statute indicates that the child in such an interview is to be sworn and nothing reflects that anything resembling the Texas Rules of Evidence should apply during the interview."). Katie has not directed this Court to any provision in the Texas Family Code or to any Texas case law which requires a trial court to disclose its identity to the child during its interview with the child pursuant to section 153.009. The record does not demonstrate that the trial court acted unreasonably, arbitrarily, or without regard for guiding rules or principles by purportedly failing to disclose its identity when conferring with C.N.

---

[24] Although the trial court did not interview C.N. in chambers, as required by Texas Family Code 153.009(a), the parties agreed to have the court interview C.N. at a different location. *See* TEX. FAM. CODE ANN. § 153.009(a). Katie does not challenge on appeal the location of the trial court's interview with C.N.

Accordingly, we hold that the trial court did not err in failing to disclose its identity when conferring with C.N.

We overrule Katie's third issue.

**Evidentiary Hearing**

In her fourth issue, Katie argues that the trial court erred in denying an evidentiary hearing related to her motion for new trial and denying her emergency motion for an evidentiary hearing on her motion for new trial to present newly discovered evidence because Katie discovered admissible and competent evidence after trial entitling her to an evidentiary hearing.

Generally, whether to hold an evidentiary hearing on a motion for new trial in a civil matter is within the trial court's discretion. *See Hamilton v. Pechacek*, 319 S.W.3d 801, 807 (Tex. App.—Fort Worth 2010, no pet.); *see also Emanuel v. Citibank (S.D.), N.A.*, No. 01-10-00768-CV, 2011 WL 5429042, at *2 (Tex. App.—Houston [1st Dist.] Nov. 10, 2011, no pet.) (mem. op.); *Landis v. Landis*, 307 S.W.3d 393, 394 (Tex. App.—San Antonio 2009, no pet.) (hearing on motion for new trial generally not mandatory). A trial court is only required to conduct a hearing after it is requested by a party and the motion for new trial presents a question of fact upon which evidence must be heard, such as when a motion for new trial is based on newly discovered evidence. *Hensley v. Salinas*, 583 S.W.2d 617, 618 (Tex. 1979); *Emanuel*, 2011 WL 5429042, at *2; *Olsen v. Comm'n of Lawyer Discipline*, 347

S.W.3d 876, 887 (Tex. App.—Dallas 2011, pet. denied); *J.L.L. v. State*, No. 01-09-00808-CV, 2011 WL 1631915, at *13 (Tex. App.—Houston [1st Dist.] Apr. 28, 2011, no pet.) (mem. op.) ("In a civil case, a trial court is obligated to conduct a hearing on a motion for new trial if (1) the motion properly requests a hearing, (2) the motion presents a question of fact upon which evidence must be heard, and (3) the motion alleges facts that if true would entitle the movant to a new trial." (internal quotations omitted)). To obtain a new trial based on newly discovered evidence, the movant must show (1) that the evidence has come to her knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is not cumulative; and (4) that it is so material that it would probably produce a different result if a new trial were granted. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex. 1983), *overruled in part on other grounds by Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003); *Xenos Yuen v. Fisher*, 227 S.W.3d 193, 204 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Notably, a party seeking a new trial based on newly discovered evidence must verify that the evidence is true and correct. *Xenos Yuen*, 227 S.W.3d at 205; *Raymond v. Raymond*, 190 S.W.3d 77, 82 (Tex. App.—Houston [1st Dist.] 2005, no pet.). A trial court does not abuse its discretion in denying a motion for new trial based on newly discovered evidence when it is not verified. *Xenos Yuen*, 227 S.W.3d at 205; *Raymond*, 190 S.W.3d at 82.

A motion for new trial must be filed within thirty days after the trial court's judgment is signed. TEX. R. CIV. P. 329b(a); *L.M. Healthcare, Inc. v. Childs*, 929 S.W.2d 442, 443 (Tex. 1996). Under Texas Rule of Civil Procedure 329b, an amended motion for new trial may be filed without leave of court before any preceding motion for new trial is overruled and "within thirty days after the judgment or other order complained of is signed." TEX. R. CIV. P. 329b(b); *see also Moritz*, 121 S.W.3d at 719–20. An amended motion filed more than thirty days after the trial court signs its judgment is untimely. *Low v. Henry*, 221 S.W.3d 609, 619 (Tex. 2007); *Moritz*, 121 S.W.3d at 719–20. An untimely amended motion for new trial does not preserve issues for appellate review, even if the trial court considers and denies the untimely motion within its plenary power period. *Moritz*, 121 S.W.3d at 720–21; *Prasad v. Cap. Farm Credit, FLCA*, No. 01-12-00585-CV, 2013 WL 3877666, at *2 (Tex. App.—Houston [1st Dist.] July 25, 2013, no pet.) (mem. op.) (untimely amended motion for new trial "is a nullity for purposes of preserving issues for appellate review" (internal quotations omitted)).

The trial court entered its judgment in this case on August 22, 2017. Katie timely filed her Motion for New Trial, or Alternatively, Motion to Correct the Final Order, on September 19, 2017. *See* TEX. R. CIV. P. 329b(a). Notably, Katie did not assert in her motion that she was entitled to a new trial based on newly discovered evidence and did not verify her motion. *See Xenos Yuen*, 227 S.W.3d at 205 (party

87

seeking new trial based on newly discovered evidence must verify motion); *Raymond*, 190 S.W.3d at 82. Rather, Katie asserted that the trial court should grant a new trial because the court erred in "changing primary custody through [t]emporary [o]rders signed on April 19, 2016"; "signing [f]inal [o]rders that did not reflect the [t]rial [c]ourt's letter ruling"; "relying on the [g]uardian [a]d [l]item's recommendation when the [t]rial [c]ourt knew that the [g]uardian [a]d [l]item did not talk to [C.N.'s] counselor . . . [or] procure [and] review any of [the] counselor's notes before or during trial"; "ignoring the wishes of [C.N.] per section 153.009 of the Texas Family Code"; "awarding primary custody to an abusive father who testified that he would not co-parent"; and "awarding attorney['s] fees to" Daron. (Emphasis omitted.) Further, Katie did not request an evidentiary hearing in her motion, and the allegations in her new-trial motion did not require the trial court to conduct an evidentiary hearing. *See Hensley*, 583 S.W.2d at 618; *H & H Wrecker v. Koctar*, No. 14-15-00311-CV, 2016 WL 3634258, at *2 (Tex. App.—Houston [14th Dist.] July 7, 2016, no pet.) (mem. op.) (trial court does not err in not holding evidentiary hearing where movant fails to request hearing in new-trial motion); *Olsen*, 347 S.W.3d at 887; *J.L.L.*, 2011 WL 1631915, at *13 (motion must properly request hearing, present question of fact upon which evidence must be heard, and allege facts that if true would entitle movant to new trial); *Landis*, 307 S.W.3d at 394; *see also Emanuel*, 2011 WL 5429042, at *2 (party not entitled to evidentiary

88

hearing on his complaint in new-trial motion because he failed to describe what evidence, if any, he would have presented to trial court had hearing been held); *Hamilton*, 319 S.W.3d at 807 (party not entitled to evidentiary hearing on new-trial motion where he failed to identify any question upon which additional evidence was required or to specify what evidence, if any, he would have presented to trial court had evidentiary hearing been held).  Accordingly, we hold that the trial court did not err in failing to conduct an evidentiary hearing on Katie's Motion for New Trial, or Alternatively, Motion to Correct the Final Order.

On October 20, 2017, Katie, fifty-nine days after the trial court signed its judgment, filed her verified Emergency Motion for Evidentiary Hearing on Motion for New Trial to Present Newly Discovered Evidence.  Katie stated that the motion was filed to supplement her previously filed Motion for New Trial, or Alternatively, Motion to Correct the Final Order, and Katie asserted that she had discovered admissible and competent evidence after trial, the late discovery of the new evidence was not due to a lack of diligence, the evidence could not have been discovered sooner, Katie had no notice before trial that the evidence existed, the evidence was not cumulative of other evidence, and the evidence is so material that it would probably produce a different result.  *See Jackson*, 660 S.W.2d at 809; *Xenos Yuen*, 227 S.W.3d at 204.  Katie further requested an evidentiary hearing on her motion.

89

As previously explained, an amended motion for new trial may be filed without leave of court before any preceding motion for new trial is overruled *and* "within thirty days after the judgment or other order complained of is signed." TEX. R. CIV. P. 329b(b); *see also Moritz*, 121 S.W.3d at 719–20. Here, Katie filed her Emergency Motion for Evidentiary Hearing on Motion for New Trial to Present Newly Discovered Evidence to supplement her Motion for New Trial, or Alternatively, Motion to Correct the Final Order previously filed on September 19, 2017. Although the trial court had not yet ruled on Katie's original new-trial motion, Katie's amended new-trial motion was not filed within thirty days of the trial court's judgment and was thus untimely. *Low*, 221 S.W.3d at 619; *Moritz*, 121 S.W.3d at 719–20. Because an untimely amended motion for new trial is a nullity and a trial court is not required to consider or otherwise hear an untimely new-trial motion, the denial of an evidentiary hearing on an untimely amended motion for new trial cannot be said to be error. *See In re Brookshire Grocery Co.*, 250 S.W.3d 66, 69–70 (Tex. 2008); *Moritz*, 121 S.W.3d at 720–21; *Prasad*, 2013 WL 3877666, at *2; *see also Hernandez v. Saldivar*, No. 04-15-00691-CV, 2016 WL 2584657, at *2 (Tex. App.—San Antonio May 4, 2016, no pet.) (mem. op.) (trial court does not abuse its discretion by ignoring untimely supplemental new-trial motion); *Equinox Enters., Inc. v. Associated Media Inc.*, 730 S.W.2d 872, 875 (Tex. App.—Dallas 1987, no writ); *cf. Kiser v. State*, 788 S.W.2d 909, 915 (Tex. App.—Dallas 1990, pet. ref'd)

(denial of hearing on motion for new trial not error where motion not timely filed). The record does not indicate that the trial court ever ruled on or considered Katie's Emergency Motion for Evidentiary Hearing on Motion for New Trial to Present Newly Discovered Evidence. Rather, on November 2, 2017, the trial court denied Katie's Motion for New Trial, or Alternatively, Motion to Correct the Final Order previously filed on September 19, 2017.

Accordingly, we hold that the trial court did not err in failing to conduct an evidentiary hearing on Katie's Emergency Motion for Evidentiary Hearing on Motion for New Trial to Present Newly Discovered Evidence.

We overrule Katie's fourth issue.

### Temporary Orders

In her fifth issue, Katie argues that the trial court erred in issuing temporary orders because the ruling made by the trial court was illogical and self-contradictory. Katie raises her fifth issue conditionally, i.e., Katie requests that this Court vacate the trial court's temporary orders signed on April 19, 2016 if we reverse the trial court's August 22, 2017 Order in Suit to Modify Parent-Child Relationship and remand the case to the trial court. Due to our disposition of Katie's other issues, we need not reach Katie's fifth issue. *See* TEX. R. APP. P. 47.1.

**Conclusion**

We affirm the order of the trial court.

Julie Countiss
Justice

Panel consists of Justices Lloyd, Landau, and Countiss.